358 So.2d 675 (1978)
David McKOWEN, M. D., Individually and for the Use and Benefit of the minor Feltus B. McKowen
v.
GULF STATES UTILITIES COMPANY et al.
No. 11841.
Court of Appeal of Louisiana, First Circuit.
March 20, 1978.
Rehearing Denied May 1, 1978.
*677 Roger M. Fritchie, Baton Rouge, of counsel for plaintiff-appellee David McKowen, M.D., Individually and for the use and benefit of the minor, Feltus B. McKowen.
Boris F. Navratil, Baton Rouge, of counsel for defendant-appellant American Home Assurance Co.
Robert J. Vandaworker, Baton Rouge, of counsel for defendant-appellant Gulf States Utilities Co.
James E. Moore, Baton Rouge, of counsel for third party defendant-appellee Aetna Casualty and Surety Co. and Asset Owners, Inc.
Robert L. Kleinpeter, Baton Rouge, of counsel for third party defendant-appellee South Carolina Ins. Co.
Dermot S. McGlinchey, New Orleans, of counsel for third party defendant-appellee Insurance Company of North America.
H. Lee Leonard, Lafayette, of counsel for third party defendant-appellee Audubon Ins. Co.
W. Paul Andersson, New Orleans, of counsel for third party defendant-appellee Chicago Ins. Co.
R. Gordon Kean, Jr., Baton Rouge, of counsel for J. S. Dougherty, Thomas P. Singletary, M. Stewart Dougherty, Jr., and J. Noland Singletary.
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
Gulf States Utilities Company (GSU), a public utility distributing electricity, and its insurer American Home Assurance Company (American) (Appellants), appeal from judgment against them, pursuant to jury trial, awarding plaintiffs special and general damages in amounts of $36,444.08 and $650,000.00, respectively, for serious electrical burns suffered by Feltus B. McKowen, minor son of plaintiff David McKowen, when the metal mast of a sailboat young McKowen was attempting to push ashore on False River (River) contacted GSU's transmission line running along the river bank. We affirm.

RELEVANT BACKGROUND INFORMATION
The "electrocution" incident occurred about noon, May 4, 1975, on the River, a former segment of the Mississippi River, which is presently a lake and is situated in Pointe Coupee Parish. The scene was the waterfront of a "campsite" belonging to Thomas P. Singletary, Noland J. Singletary and Juliette Singletary, wife of Malcolm S. Dougherty, which property was under lease to a corporation known as Asset Owners, Inc. (Asset) of which concern Malcolm S. Dougherty was president. Asset is wholly owned and controlled by the Singletarys for all practical purposes. All of said owners, Asset, Dougherty and their numerous insurers were also made defendants herein.
On conclusion of trial and before the jury was charged, all defendants except Appellants compromised the claims against them for the sum of $350,000.00, plaintiffs reserving all rights against Appellants. The trial judge declined Appellants' request to inform the jury of the compromise and the amount thereof. The judge did, however, instruct the jury that while Appellants were the only remaining defendants, the jury must determine the liability of all defendants. The jury exonerated all defendants save Appellants. Plaintiffs have answered the appeal requesting an increase in the award of general damages.
The Singletary Camp (Camp) is situated on a plot of land lying between La. Highway 1 and the bed of the River. The frontage along the highway is in effect a bluff running toward the water approximately 200 feet where the land drops abruptly and then slopes an additional 100 feet or so to normal low water level. The property was purchased by the Singletarys many years ago. Rather recently it was leased to Asset for a ten year term with a renewal option. The lease provides for a monthly rent of $500.00, and obligates Lessee to pay all expenses of operation including insurance, taxes and utilities. Lessee is also required to hold lessors harmless from liability for *678 claims for injury to persons hurt on the premises. All improvements constructed by Asset become the property of Lessors at the end of the lease. Since acquiring the lease, Asset has spent approximately $50,000.00 improving and enlarging the Camp, erecting a swimming pool and tennis court on the bluff and erecting two piers or walkways extending from above the high water mark into the water beyond the normal low water mark. One pier has a boathouse attached.
GSU's transmission line runs along the river bank between the high and low water marks pursuant to a servitude agreement or right of way from the State of Louisiana which owns the area where the line is constructed. The line runs along the bank virtually the entire river length which is approximately 10 miles. In some areas, however, the line has been rerouted to run along Highway 1. The line consists of two "hot" or charged transmission-distribution lines, strung one above the other on poles, with a neutral wire between. The sailboat contacted the lower line which carries 2400 volts of electricity and is suspended 23 feet 5 and ½ inches above the land below. During low water, the land beneath the line is dry to a distance of about 70 feet to the low water line. On the day in question, the water was high due to recent rains. The water was approximately 10 inches deep under the transmission line and the water line extended a few feet shoreward of the wire. A dry bank of some 30 or so feet existed between the water's edge and the foot of the bluff. The line was approximately 22 feet 8 and ½ inches above water level.
Over the years, the River has become progressively more popular as a fishing and summer resort. Both banks of the River are now lined with camps, permanent residences and summer homes of every kind and price range. Many of these "camps" have piers jutting out into the River for the convenience of their owners. Many also have boat houses. In more recent years, water skiing and sailing have become commonplace activities on the River. A marina type operation known as the Lighthouse is situated about .9 miles from the Singletary Camp; the Pelican Yacht Club, a sailing club, is located about 2 or so miles away. Approximately .4 miles away is a very popular restaurant.
On the day of the accident, Feltus McKowen, then 16 years of age, was on an outing with his teen age companions John Shoptaugh, Manya Peters and Mary K. Gerace. The party, clad in bathing suits, was sailing on the River. Feltus mentioned that he knew the Singletarys who owned a nice camp on the opposite side of the river, and that he wished his companions to see it. None of the group, except Feltus, had visited the Singletary Camp previously. Feltus had been there perhaps two or three times. John Shoptaugh, skipper of the sailboat, sailed the vessel to Singletary Camp boathouse pier and tied the boat to the end of the pier, which was about ankle deep in water. Feltus and Miss Gerace went ashore. Shoptaugh and Miss Peters remained in the sailboat. Feltus and Miss Gerace unexpectedly encountered Mr. Malcolm S. Dougherty and his son carrying a sailboat toward the water. Dougherty had purchased the boat for his children and intended to assemble the craft for launching. A catamaran owned by Thomas P. Singletary was floating free next to the pier a distance of about 10 to 15 feet out from the water's edge. After an exchange of greetings between Feltus and the Doughertys, the conversation turned toward the catamaran. The nature of the discussion is in serious dispute. Following the discussion, Feltus and Miss Gerace entered the water with the intention of beaching the catamaran. The catamaran consists of twin pontoon hulls connected by a square aluminum frame on which is stretched a rubber trampoline style deck. It is equipped with an aluminum mast 22 feet 4 inches long. The mast mounts in a socket on the forward part of the frame, which socket is 2 feet above water level when the craft is afloat. The mast was in place and extended to a height of 24 feet 4 inches above water level. Feltus positioned himself in thigh-deep water at the rear of the *679 catamaran. He instructed Miss Gerace, who was between the craft and the water's edge in water about mid-calf deep, to take hold of a pontoon and pull toward shore while he pushed the vessel. In pushing, he placed his chest against the metal cross bar of the frame and shoved with his body and hands. When the front of the pontoons reached a point about 2 or 3 feet landward of the line and was just about on dry land, the mast of the catamaran touched the wire. The McKowen lad was transfixed to the metal frame. Mr. Dougherty, who had resumed assembling his boat, was made aware of the accident by the noise resulting from the contact and the screams of Miss Gerace. Miss Gerace, who was changing position from one pontoon to another at Feltus' suggestion, was not touching the vessel when the mast contacted the line. Mr. Dougherty took a wooden paddle, waded into the water and pushed the catamaran outward, breaking contact with the wire. The McKowen lad fell free into the water and was brought ashore by John Shoptaugh and Mr. Dougherty.

THE ISSUES
Although Appellants are the sole remaining defendants, liability of all defendants is before us because Appellants, in addition to urging GSU's freedom from negligence, contend that the jury erred in rejecting Appellants' alternative demands that said other defendants were either solely liable for the accident or were joint tort feasors with GSU. Appellants also reurge their plea of contributory negligence on the part of Feltus McKowen in bar of plaintiff's claims. Finally, Appellants maintain the trial judge erred in failing to give certain requested instructions and in giving improper instruction concerning the duty of care owed by the owners of electrical transmission lines.

CONTRIBUTORY NEGLIGENCE OF FELTUS McKOWEN
Feltus McKowen is a bright young man. He was a sports fan who actively participated in all sports, particularly swimming and cross country running. His routine included 8 miles of running daily. He had been a lifeguard. He had sailed on the River numerous times before and had been to the Singletary Camp on two or three prior occasions. For all practical purposes, he could not independently recall the incidents leading to the accident. He was unaware of the presence of the transmission line. He did not recall seeing the line while pushing the catamaran.
Appellants maintain McKowen was negligent in not seeing the line. They infer that because he frequented the River and participated in water sports thereon, he should have been aware of the line and taken steps to protect himself. They charge that McKowen had to look up while pushing the catamaran and that had he been observant at all, he would have seen the line and avoided it.
In so contending, Appellants rely upon Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La.1976), which held a 16 year old youth contributorily negligent for climbing a 30 foot utility pole to cut and remove a wire. It is elementary that contributory negligence is a matter of fact to be determined in the light of the circumstances of each case. Cates appropriately noted that "Electric wires on a pole are an announcement of danger to almost anyone smart enough to get himself in contact with a wire above the ground". The facts in Cates make it totally inapplicable to the case at hand.
We find no useful purpose that would be served by a detailed analysis of all cases dealing with contributory negligence in cases of this nature. It suffices that in this case, the record shows no awareness of McKowen concerning the presence of the line. Under the circumstances, we find no evidence to charge him with notice of its presence. Moreover, nothing indicates any awareness on his part of a known danger or any intent on his part to voluntarily or unnecessarily expose himself to danger. See Burley v. Louisiana Power and Light Company, 327 So.2d 585 (La.App. 4th Cir. *680 1976). We concur in the jury's finding McKowen free of negligence.

NEGLIGENCE OF GSU
In essence, GSU contends that it was free from negligence because it complied with the U. S. Department of Commerce, National Bureau of Standards, Safety Rules for the Installation and Maintenance of Electrical Transmission Lines, Handbook 81 (Code), more particularly Section 232, which prescribes minimum clearances under specific circumstances. GSU notes that Section 232 does not prescribe specific clearances for lines strung between high and low water marks on the banks of lakes or streams. According to Section 232, a line overhanging an area involving pedestrian traffic only is required to be elevated 15 feet. A line crossing a driveway is required to be elevated 23 feet. It is suggested that the area in question was in effect a pedestrian area and, alternatively, one requiring no greater elevation than a driveway or public road.
We note other provisions of the code which are pertinent, namely:
Section 20, Rule 200 (Scope of Rules) Page 42.
"(B): These rules are not complete specifications but are intended to embody the requirements which are most important from the standpoint of safety to employees and the public.
"(C): Construction should be made according to accepted good practice for the given local conditions in all particulars not specified in the rules."
Section 21, Rule 210, Page 43, General Requirements Applying to Overhead and Underground Lines:
"All electric supply and communication lines and equipment shall be of suitable design and construction for the service and conditions under which they are to be operated."
Rule 211, Page 44, Installation and Maintenance:
"All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable."
Rule 214, Page 45, Isolation and Guarding:
"(A) Current carrying parts. To promote safety to the general public and to employees not authorized to approach conductors and other current-carrying parts of electric supply lines, such parts shall be arranged so as to provide adequate clearance from the ground or other space generally accessible, or shall be provided with guards so as to isolate them effectively from accidental contact by such persons."
Our jurisprudence is established to the effect that compliance with the Code does not per se relieve the owner of electrical transmission lines of negligence. The hereinabove cited rules make it clear that the Code prescribes minimum requirements only. In Burley v. Louisiana Power & Light Company, 319 So.2d 334 (La.1975), the Supreme Court observed that the Code is entitled to such probative weight as it warrants in the judgment of the court. We add that this determination must be made in the light of the circumstances of each case.
Generally, the land beneath GSU's line is dry. On the day of the accident, the water stood at 18.59 feet, somewhat above the normal low water mark. Records of the U. S. Army Corps of Engineers, New Orleans Division, show that during the four year period preceding the accident, the River rose to 18.59 feet or above on at least 44 days. During the ten year period preceding the accident, the River rose to 18.59 feet or higher every year except two.
GSU employees were familiar with the activities and water sports being indulged in on the River. They were aware of the Lighthouse, a marine type establishment where GSU had raised the transmission lines to accommodate boats, which establishment is about .9 miles from the Singletary Camp. GSU had also elevated lines at the Pelican Yacht Club situated about 2 *681 miles from the scene of subject accident. P. O. Davidson, a GSU employee, was cognizant of a similar accident which happened months prior to subject accident when a sailboat mast contacted GSU's line. It also appears that an aerial reconnaissance by GSU employees prior to this accident disclosed an area along the River where the masts of sailboats were reported to be dangerously near the line.
It further appears that when the line was constructed years ago, it was over water because the level of the River was then very much higher. Subsequent to installation of the line, the level of the River was lowered by means of a control structure and the normal level of the water was reduced several feet, exposing bank which had previously been covered during normal low water.
The record amply supports the finding that GSU must be charged with knowledge that at times boats, including sail boats, would be brought beneath its wires at almost any point along the River. People owning camps and homes were obviously launching and returning to land beneath the lines during periods of high water and were using dry land beneath the line for the same purposes during low water.
Under such circumstances, it was incumbent on GSU to elevate its lines to such height necessary to the safety of the boating public. Since the Code apparently prescribes no minimum height for the area in question, it was GSU's obligation to provide for the public safety by taking practicable steps to reduce the hazard; this GSU did not do. It did not provide such clearance as was reasonably required for reasonably foreseeable use of the surface below. GSU also failed to provide guards to effectively isolate its line from accidental contact by persons using the surface below for reasonably foreseeable purposes.

NEGLIGENCE OF THOMAS P. SINGLETARY, J. NOLAND SINGLETARY AND JULIETTE SINGLETARY DOUGHERTY
As owners of the land, these parties are allegedly liable for failure to negotiate with GSU to remedy the condition existing. There is no record proof of said parties' ownership of the land in the servitude area. It is conceded that GSU's servitude is from the state and not the Singletarys. From the record, we deduce that the land on which the line is situated is a portion of the river bed belonging to the State of Louisiana. Assuming, arguendo, that the land was individually owned, it is not shown that any owner had knowledge of a dangerous condition and therefore had no duty to request an alteration. Moreover, control of the line rests exclusively with GSU, which is primarily responsible for its construction and maintenance.
It is suggested that these owners had knowledge of the danger because two teen age sons of Thomas P. Singletary had a similar accident while assembling a sailboat on dry land under the wire. The accident, which happened about 14 months prior to subject incident, resulted in only minor injury to an acquaintance of the Singletary boys. The matter was kept secret by all concerned because of fear on the part of the Singletary boys that their camp privileges would be curtailed if the incident were disclosed. The record conclusively establishes that none of the owners were made aware of this incident until after the McKowen accident.
The owners did not grant the servitude. While they were aware of the line, they were unaware that it posed a danger. They had no knowledge of the prior similar incident on their premises. We find, as did the jury, that they were under no duty to request alteration of the line under the circumstances of this case.

LIABILITY OF THOMAS P. SINGLETARY
As owner of the catamaran, Singletary allegedly possessed a dangerous instrumentality. Additionally, it is suggested that as father of the boys who had experienced a similar incident, he is liable for their tort in failing to report the occurrence *682 based upon a parent's liability pursuant to La.C.C. Articles 2317 and 2318. The catamaran is not per se a dangerous instrumentality. Singletary did not know the McKowen lad prior to the accident, and was not present when the accident occurred. We find he owed no duty to McKowen under the circumstances.
We also find no liability on Singletary's part because of the actions of his minor sons in not reporting the previous accident. In so doing, the boys did not commit a tort. They owed no duty to McKowen under the circumstances.

NEGLIGENCE OF MALCOLM S. DOUGHERTY
Dougherty's liability is urged on the dual ground that as President of the lessee, Asset, he was obliged to require GSU to remedy the dangerous condition created by the line and that, being present and having requested McKowen to beach the catamaran, he should have warned McKowen of the danger.
The evidence is in direct conflict concerning whether or not Dougherty requested McKowen to beach the craft. Miss Gerace testified in effect that Dougherty requested McKowen to beach the boat which was floating free. Mr. Dougherty testified that he did not request the youth to bring the craft to shore. He testified in effect that McKowen asked permission to look at the boat and to show it to his friends, and that Dougherty gave such permission and merely requested that McKowen tie the boat back to the dock when he finished. As mentioned before, McKowen had no independent recollection of events. His other acquaintances were not within hearing distance of the conversation between him and Dougherty.
As President of lessee corporation, Dougherty knew of the presence of the lines, but had no more control over the lines than did the owners of the land. The jury evidently concluded that he had no reason to believe McKowen would move the boat to land and owed no duty to the McKowen lad. Under the circumstances, we find no error in the jury finding that Mr. Dougherty was not negligent.

ERRONEOUS JURY INSTRUCTIONS
Appellants contend that the trial judge improperly instructed the jury that "Either the wires must be insulated or at least placed beyond danger line of contact with human beings", and that "if you find that an ultrahazardous situation existed by reason of an uninsulated high voltage line, then the utility is liable . . . without the necessity of further proof of fault.. . ." Appellants suggest that the alleged charge in effect instructed the jury that uninsulated high voltage lines are hazardous per se and the utility is liable for anyone injured thereby.
Appellants have quoted the language out of context in that the first quote was preceded by instruction that a utility company maintaining such a potentially dangerous facility is held to a high degree of care. The latter was implemented by the instruction that a utility is liable for damage to any person who might foreseeably contact a wire which creates a hazardous condition. We find this to be proper instruction.
The issue of whether a jury should receive evidence of settlement by one or more alleged co-tort feasors, and the amount thereof, appears res nova in our jurisprudence.
It is well settled, however, that our jurisprudence favors compromise and settlement of litigation. State, Department of Highways v. Hunter, 309 So.2d 786 (La. App. 1st Cir. 1975).
We think the trial judge's refusal to give the instruction was proper because the information would have unduly prejudiced the jury regarding the issues of quantum and liability of the defendants who compromised the claims against them. It is elementary that such a disclosure would have no relevance to the liability of GSU. The jury's awareness of the settlement may have prompted the jury to reduce the *683 award against GSU if the jury found GSU alone liable. Such an occurrence would redound to the benefit of GSU and would, in our view, be improper as it would enable GSU to benefit from a settlement by one not liable. The settlement could be relevant to GSU only if the compromising defendants were found to be solidarily liable with GSU thereby entitling GSU to contribution if GSU paid the entire judgment. Plaintiffs took a calculated risk in accepting $350,000.00 from the settling defendants. The settlement would have been adverse to plaintiff if the jury had rendered a verdict which held the compromising parties alone liable for an amount in excess of $350,000.00, or held them liable in solido with the remaining defendants in an amount such that their proportionate share of the judgment exceeded $350,000.00. We believe that a plaintiff taking such a compromise risk must be allowed to benefit as well as lose from a compromise favored in law. See the reasoning used in Bill Currie Ford, Inc. v. Cash, 252 So.2d 407 (Fla.App.2d Dist. 1971).

DAMAGES
Although Appellants have not complained of the amount of the award, we must address the question of general damages because plaintiff's answer to the appeal requests an increase of said amount.
Feltus McKowen was a 16 year old high school student at the time of the accident. He anticipated a dental career. The accident resulted in most severe electrical burns which the medical testimony categorizes as the most difficult type of burn. The current entered his body via the chest and right arm; it exited on the back of the left hand and wrist. In effect, a hole was burned in his chest, destroying the lower half of the sternum (breast bone), a considerable portion of the rib cage over the heart area, all flesh in the area, virtually all of the pericardial sac (a membrane containing heart protective fluid), and left a burn scar the size of a silver dollar on his heart. His right arm was literally blown open, destroying virtually all of the biceps and considerable flesh. Surgery has restored the arm to a nearly normal appearance, but the loss of muscle has greatly reduced the strength of that member. His left wrist is somewhat limited in motion, as are the fingers on his left hand.
The patient was hospitalized in Baton Rouge from the date of the accident until May 29, 1975. During this interval, he underwent surgery and numerous painful skin grafts. His injuries were medically described as most painful. On May 29, 1975, the patient was moved to the Shriners Burn Clinic, Galveston, Texas, which specializes in the treatment of burn cases. Here the patient underwent additional surgery and skin grafts. On the night of June 5, 1975, a hole, the size of a silver dollar, erupted in the heart. The hole was closed by emergency surgery performed while the lad was fully awake. Three hours later, the sutures closing the hole failed and the surgical process was repeated, again while the patient was conscious. The patient recovered and after several weeks of additional hospitalization in Galveston and Baton Rouge, he was discharged wearing a fitted plastic shield over his chest to protect his heart because the normal protective rib cage and flesh no longer exists. This shield must be worn for the rest of his life. Despite the injuries, the patient leads a fairly routine life for a young man his age.
Plaintiff took considerable effort to attempt to establish loss of future income because of Feltus' inability to become a dentist due to the loss of strength in his left wrist and right arm. He is now a business administration student in college. We are not particularly impressed with the testimony offered to establish the difference in earning capacity between a dentist and a college graduate with a degree in business administration.
Unquestionably, Feltus has suffered most severe and intense physical and mental pain. He will undoubtedly experience additional pain and discomfort during his lifetime. We view the award as being mostly for pain and suffering and, to some extent, compensation for loss of future *684 earning capacity. We find the award of general damages well within the discretion permitted the jury pursuant to Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977).
The judgment is affirmed at Appellants' cost.
Affirmed.