398 So.2d 560 (1980)
Milton KENT, Jr., as Curator of the Estate of his Interdicted Son, Keith Kent
v.
GULF STATES UTILITIES COMPANY et al.
No. 13205.
Court of Appeal of Louisiana, First Circuit.
May 5, 1980.
*561 Charles R. Moore, Baton Rouge, for plaintiff-appellant Milton Kent, Jr., etc.
William L. Wilson, Baton Rouge, for defendant-appellant Gulf States Utilities Co.
William J. Doran, Jr., Baton Rouge, for defendant-appellant W. L. Landon, Jr. & Killian H. Kupp.
Frank Fertitta, Baton Rouge, for defendant-appellee Hilliard Barber, A. L. Barber, Jr., Allstate Ins. Co.
Before COVINGTON, LOTTINGER and COLE, JJ.
COLE, Judge.
Milton Kent, Jr. instituted this tort action as curator of the estate of his interdicted son, Keith Kent. Keith was involved in an electrocution accident on January 22, 1976, sustaining very severe injuries resulting in permanent physical and mental disabilities. He was eighteen years old at the time.
Impleaded as defendants were Gulf States Utilities Company, the State of Louisiana (through the Department of Highways, now the Department of Transportation and Development), L. Hilliard Barber, A. L. Barber, Jr., W. L. Landon, Jr., Killian H. Kupper and Allstate Insurance Company. The State of Louisiana filed the peremptory exception, raising the objection of no cause of action based upon La.R.S. 23:1032, 1061 (exclusiveness of workmen's compensation remedy). The court, agreeing the state was the statutory employer of Keith Kent, sustained the exception and rendered judgment dismissing this defendant.
After a lengthy trial by jury and closing arguments by counsel, a settlement agreement was entered into by plaintiff and the Barbers. This resulted in judgment dismissing plaintiff's demands against these two individuals and their liability insurer, Allstate.
Defendants, Landon and Kupper, stipulated the dismissal of their third party demand against the Barbers reserving their third party demand rights against Barber Brothers Contracting Co., Inc. and its bonding surety who, coincidentally, was Allstate. As employees of the Department of Highways, they contend an indemnity clause in a construction contract entered into by Barber Brothers and the Department for construction of a four-lane segment of Greenwell Springs Road protects them from damages. Alternatively, Landon and Kupper seek contribution if cast in judgment.
Before the trial court instructed the jury, motions and amended pleadings accommodated the posture of the litigation resulting from the settlement. Over the objection of *562 plaintiff, the court concluded it was necessary to charge the jury relative to liability of the Barbers in addition to the remaining defendants, Landon, Kupper and Gulf States. Underlying the court's decision was the solidary nature of any obligation owed plaintiff by all tort-feasors and the right of each defendant, if cast, to enforce contribution. La.C.C. art. 2103.
Following its deliberations, the jury returned a general verdict in favor of Keith Kent and against L. Hilliard Barber, A. L. Barber, Jr. and Gulf States Utilities for the sum of $3,000,000.00. The court, applying La.C.C. art. 2203 and its jurisprudential interpretations, entered judgment against Gulf States for $1,000,000.00, legal interest, and one-third of the costs. It dismissed plaintiff's claims against Landon and Kupper and, based upon the settlement, dismissed plaintiff's claims against the Barbers and Allstate as their individual insurer. The court further dismissed the third party demand of Landon and Kupper against Barber Brothers and against Allstate in its separate capacity. In so doing, the court held the indemnity clause relied upon did not apply to the negligence of the Highway Department's own employees. Lastly, the court included dismissal of the state in the judgment.
Keith Kent was employed by the Barber Brothers firm at the time of the accident and was engaged in construction work arising out of the contract for four-laning Greenwell Springs Road. He sued Landon, Kupper and the two Barbers in their capacities as executive officers or those having supervisory control over the project. L. Hilliard Barber was safety superintendent for Barber Brothers and A. L. Barber, Jr. was its vice-president in charge of the project. Landon and Kupper were Project Engineer and Inspector, respectively, for the Department of Highways. Gulf States owned and maintained the high voltage distribution line which inflicted the injuries suffered by Keith Kent.
Plaintiff appeals seeking to have liability imposed upon Landon, Kupper and the State. He also seeks an increase in the amount awarded. Landon and Kupper, in order to protect their interests should they ultimately be cast in judgment, appealed the dismissal of their third party demand against Barber Brothers and Allstate. Gulf States appeals the assessment of liability against it and urges that the $3,000,000.00 awarded is vastly in excess of anything that might be justified in this case.
Plaintiff assigns as errors the trial court's refusal to enter judgment against Gulf States in the amount of damages assessed by the jury less a credit for the amount of the settlement ($500,000); the jury's failure to find Kupper liable (apparently abandoning his appeal as to Landon); the trial court's release of the State (Highway Department) on the basis of immunity under the workmen's compensation law; and, the failure of the trial court to access all court costs against Gulf States.
Landon and Kupper assign as error the trial court's finding that the indemnity clause in the construction contract was not applicable to them thereby denying them protection from any damages for which they may ultimately be assessed.
Gulf States specifies a total of fifteen errors of which ten relate to the court's instructions to the jury. The remaining errors assigned raise questions as to the admissability into evidence of a document (employer's report of injury), the lack of responsibility for Kent's injuries, and the defenses of contributory negligence, assumption of risk and intervention of a third party.
We find it unnecessary to enunciate and treat all the issues raised by the errors assigned. The only issue essential to a determination of this case is whether the conduct of Keith Kent bars his recovery. We hold, regardless of the several theories of liability urged by plaintiff, the conduct of Keith Kent does bar his recovery and it was manifest error for the jury not to so find. We assume, without holding, the facts and law would otherwise impose liability upon Gulf States, Kupper and the State; and we assume, without holding, the jury verdict was based upon or guided by essential and *563 correct legal principles. The facts relative to the defenses of contributory negligence, assumption of risk and victim fault are so clear and compelling they mandate resolution of this litigation by treatment of those facts.
Early in 1971 the Department of Highways notified Gulf States it would be necessary to relocate various electrical facilities in connection with the four-laning of Greenwell Springs Road. By letter dated May 13, 1971, the Department approved an agreement with Gulf States for that purpose and authorized work to begin. Gulf States, in February 1974, completed the construction of eighteen 7620 volt distribution lines across the road, including the one which injured Keith Kent approximately two years later.
On August 24, 1973, the contract for the construction of the Courtland Drive-Sullivan Road segment of the project was entered into by the Department and Barber Brothers. Thereafter the Department decided the new concrete road surface should undergo a scratching (grooving) process to aid in preventing the hydroplaning of automobiles during wet weather. To accomplish this purpose a "force account" was imposed upon Barber Brothers which essentially was a cost-plus amendment to the basic contract. The "scratching" began in October 1974.
Keith Kent was hired by Barber Brothers a few weeks prior to the electrocution accident. His duties on the project were to scratch the new concrete with a metal rake to groove the surface. The metal rake, five feet in width, was pulled across the freshly poured concrete by use of an aluminum pole attached to it which consisted of various joints screwed together to get the desired length. Testimony relating to events leading up to the accident and to circumstances attendant to the scene is summarized, as follows.
On the day before the accident the construction crew began full-width paving of the two westbound lanes having a width of 26.5 feet. Mr. Landon observed Keith Kent and his co-worker, David Jenkins, scratching the new surface using what is described as the "push-pull" method. With the use of the aluminum pole which had been extended to approximately thirty feet in length, one of the men would pull the rake across the surface, move it over to the adjoining area and then push it back across. The pushing aspect caused a gouging effect in the concrete which did not meet contract specifications. As project engineer for the Department of Highways, Landon ordered the men to cease using the push-pull method and to employ the "bench" method of scratching. This entailed the use of a walk bench or bridge device which is common to such jobs and the rental of which was specifically included in the force account for the scratching process. The bench, on wheels, straddled the full-width slab and afforded a means of transferring the rake from one side to the other by sliding it across. This eliminated the need to push the rake.
Mr. Landon testified the bridge was not needed when only a single or split slab was poured and the pouring of a single slab was done quite a bit on the job. He further testified he had never seen the "flip-flop" method of scratching used on a full-width slab but recalled it being used in a few instances around some intersections. The flip-flop method entailed holding onto the rake head, raising the aluminum pole into the air, and then causing the pole to fall across the slab where it was caught by the companion worker who would pull the rake across the road surface. The reverse of this process would follow thus creating the characteristic flip-flop motion. Both L. Hilliard Barber and A. L. Barber, Jr., testified they had never seen the flip-flop method of scratching used on the job.
On the day of the accident Keith Kent and David Jenkins, as working partners, continued with the scratching process. Jenkins testified they began their work that day using the bench to get the scratching device back and forth across the full-width slab. He explained that during the morning the concrete finishers needed the bench and it was relinquished to them. Thereafter, *564 he and Kent began using the flip-flop method. In a statement given six months after the accident, Jenkins was unable to say who instructed them to use the flip-flop method. However, at trial he testified Kupper (the Highway Department inspector) told them to give the bench to the finishers and to use the flip-flop method. He stated Kupper demonstrated the method since "... otherwise, we wouldn't have known how to do it." Jenkins stated it was the first time he had ever used the method of flipping the tool over. At this time, according to Jenkins, he and Kent were approximately fifty feet from the high voltage line involved in the accident. The line was one of three parallel lines strung between two poles and crossing the highway area at an angle.
Jenkins testified he and Kent were aware of the presence of the power lines. He admitted Kupper told them about the lines and that a concrete finisher, Wes Smith, mentioned them several times. Jenkins recounted how he and Kent discussed the presence of the lines, and the fact they could be electrocuted, and in explicit detail described the precautions they took to avoid the lines as they got closer to them. At one point in his testimony, Jenkins said:
"I can put it like this and probably clear it up. We did state the fact that the line was there and one of us could be electrocuted."
To minimize the danger, Jenkins and Kent would walk the tool away from the lines and flip the pole across the slab. They would then walk the lowered pole and rake back to the immediate vicinity of the lines and pull the rake across the surface. This technique, which was worked out by Jenkins and Kent, was repeated several times until they had worked underneath and beyond the lines a distance of about eight to ten feet. In the words of Jenkins:
"So we would walk back away from the power line until we passed completely under it. We had passed under the power line when the accident happened. And once we got on the other side of the power line, we were walking also away from the power line in the opposite direction then and ... to flip-flop; hold his end and hold my end up and then walk back to sit it down to work it."
The aluminum pole, when extended to approximately thirty feet, was described as being limber, clumsy and wobbly. An examination of it reveals it to be somewhat flexible. Jenkins testified it was impossible to swing the pole back and forth through the air in a horizontal manner and it had a tendency to whip back in the opposite direction from which it was pulled when raised in the air.
When the accident happened Keith Kent was closer to the power lines than was Jenkins due to the angle at which the lines crossed the area. Jenkins estimated he was about sixteen to twenty feet from the lines. An examination of the lines after the accident established the pole made contact with the inside of the nearest outside line. It follows the pole was between the middle line and the outside line when it either touched the line or came within a fraction of an inch which caused the current to arc. The area in and around the scene of the accident was unlevel in places as one might expect a construction site to be.
Although Jenkins testified he did not actually see the accident happen, he did observe sparks coming from the line and pole when the two met. Jenkins said he was looking up in the air at the time waiting to catch the pole "because the pole was in the air." When asked if he tried to warn Kent about the power line, Jenkins testified:
"The only warning that Keith and I discussed was on this side of the line; We were aware of the line being there, and we discussed the line a bit. As far as I'm concerned, when I got on that side of the line I was sure, you know, that the line was still there and I was aware of it. But we didn't really discuss it after that."
Jenkins estimated the bench was about fifty to seventy-five feet from them at the time of the accident. He did not ask anyone if he and Kent could use the bench when they got to the immediate vicinity of the power lines. He admitted no one told *565 him he could not get the bench and use it nor did anyone tell him he had to use the flip-flop method under the wires. He could not recall if the finishers were using the bench at the time he and Kent needed it.
Kupper testified he had seen the flip-flop method used prior to the accident but never on a double width slab such as was being poured at the time of the accident. He stated this was the first time the bridge (bench) had not been used under those circumstances. He knew someone had gotten the bridge from Jenkins and Kent and the flip-flop method was in use by them. He emphatically denied the statement of Jenkins that he, Kupper, had instructed Jenkins and Kent to flip the pole back and forth.
As regards the danger caused by the presence of the power lines and whether he warned Kent and Jenkins of the danger, Kupper testified:
"Yes, sir, I did. Approximately forty-five or fifty minutes previous to the accident I had warned them that the wire was existing up there and showed them the wire."
"I told them to be careful because the wire existed and for them to look out for it. And, of course, they heard me and I never thought any more about it."
Kupper also testified he later heard Wes Smith warn Kent and Jenkins about the power lines. Kupper stated: "They were in close range of the lines whenever Wes Smith alerted them about the lines, say fifty or a hundred feet."
Kupper's job entailed moving up and down the entire paving operation inspecting the work product of the contractor to make sure contract specifications were fulfilled. He did not observe Kent and Jenkins working under the power lines. When he heard the electrical boom resulting from contact with a wire he was some distance away.
Charles Wesley Smith, the cement finisher, testified he saw Kent and Jenkins using the flip-flop method just prior to the accident. According to Smith, he had never seen the method used before this time. Smith was working approximately thirty-five or forty feet from the power lines at a point where the paving ended. Upon observing the power lines and the men with the scratching device, he left the side where he was working and went around the "header" to warn the men. The "header" is a piece of wood at the end of the slab used to contain the concrete.
Because of its factual impact upon the issue under consideration, we quote the following from the transcript of Smith's testimony:
"A. I quit my work and went around the header; I told Keith KentI tapped him on the shoulder; I said, watch the wires. He laughed. He just laughed at me.
Q. What was his reaction? Did he know what you were talking about?
A. Oh, yeah.
Q. What was his reaction?
A. He laughed. He said, it's not going to get me; it will get my partner.
Q. And how far away from the wires were they at the time?
A. Oh, they wereI don't know how many feet it was, but it was very close.
Q. What happened after that?
A. After I told him, after he laughed about it and said the few words he said I walked off. And I walked about twenty feet at the most and that's when the accident occurred. I heard the noise.
....
Q. Did you stop along the way or did you just walk the twenty feet?
A. I just walkedcontinuous walk.
Q. At the time that you told Keith Kent about the lines, did he have anything in his hands?
A. Yes, sir, he had the aluminum pole.
Q. In his hand at the time?
A. In his hand at the time.
Q. Did you see the accident occur yourself?
A. No, my back was turned to it.

*566 Q. Tell the jury what you heard and saw.
A. What I heard and sawabout the noise? I heard a noise that went "Boom" like that and then popped just like lightning hit. And then when it popped I turned around fast and the pole was falling and he had fell slumped outside the slab."
Under cross-examination Smith made contradictory statements about whether he thought the aluminum pole was long enough to reach the wires. It is more reasonable to believe his assertion he warned the men because he thought it possible the pole would get into the wires. And, contrary to other contentions, he denied telling A. L. Barber, Jr. he saw Kent lose his balance, or trip and fall.
Smith further testified there were two benches on the job, one behind the "joint machine" used by him, and another one behind it for use in the scratching operation. He noted Kent and Jenkins could have used one of the benches, thus eliminating raising the pole in the air, had they chosen to do so since both were available and not in use at the time. Smith also agreed if Kent and Jenkins wanted to avoid the wire, they could have taken the rake and walked around the header with it and then pulled it across the slab. He explained they were close enough to the header to do so.
Homer Lee Harvey was employed by Barber Brothers at the time of the accident. At the time of trial he was employed by a construction firm in Houston, Texas. He testified his position on the Greenwell Springs Road project was that of foreman in charge of the concrete finishers and the two men (Kent and Jenkins) doing the scratching or texturing. His duties included warning employees of unsafe acts or conditions on the job.
According to Harvey, earlier in the day of the accident he told Kent and Jenkins to use the push-pull method of scratching. Later, he observed them using the flip-flop method. Not more than an hour before the accident, he warned Kent and Jenkins to watch out for the power lines. He testified:
"Well, we were about a hundred and fifty, two hundred feet from the power lines. And I went back there to bring the curing machine on up there. They were already up with the brooms and stuff. So I told them they were going to be getting close to the power lines with the brooms so to watch out for them."
Harvey said both men acknowledged his instructions. Although he had not seen the flip-flop method used before, Harvey saw nothing unsafe about the procedure except when used close to the lines. And, he said: "David and both Keith said they would look out for them when they got up there."
Harvey's testimony also covered these points. Kent and Jenkins screwed the pole joints together. He did not instruct them to use the flip-flop method nor prohibit its use. He did not remember anyone telling them to use the method but assumed Kupper may have told them to use it. He did not suggest to them they use a bench although two benches twenty-five or thirty feet away were available. At the time, Kent and Jenkins could have gotten either of the benches to use under the lines. Or they could have walked the rake and pole around the header (the end of the concrete) which was about twenty-five feet away. Walking the pole away from the lines to flip it across the slab was a technique the men thought of themselves. Harvey felt this demonstrated the men were heeding his warning. He also thought there was no need to flip the pole around the wires.
James L. Mitchell, an employee of the Highway Department, heard Wes Smith warn Kent and Jenkins about the lines. Ben Foster, another Department employee, upon hearing the noise turned around in time to see Kent falling. Neither of these workers saw Kent raise the pole into the line.
The day after the accident Thurman O. McKnight, claims supervisor for Gulf States, went to the scene of the accident and measured the height of the line at the *567 point it was contacted by the aluminum pole. He found it to be twenty-five feet, eight inches from the ground and twenty-four feet, eight inches from the concrete slab. It is undisputed the National Electric Safety Code requires such a line to be elevated a minimum distance of twenty feet. While the height of the line exceeded the Code requirements by about twenty-five per cent, the experts called by the parties disagreed whether various general provisions of the Code were being violated at the time of the accident. The disposition of this case does not require us to examine these contentions. The fact the line was not insulated with a protective covering of one sort or the other was known to all persons involved, including Keith Kent.
Criteria for determining if Keith Kent was contributorily negligent as regards Kupper and the State are: (1) relative knowledge of the danger by the supervising employee (Kupper) and the injured employee (Kent); (2) relative control over the employee's situation; (3) the degree to which the employee's conduct is voluntary on his part; (4) alternatives available to the employee; (5) obviousness of the danger; and (6) relative ability to eliminate the danger. Miller v. Employers Mutual Liability Insurance Company of Wisconsin, 349 So.2d 1353 (La.App. 2d Cir. 1977).
When we apply the above criteria, the evidence before us establishes Keith Kent had as much knowledge of the danger posed by the high voltage line as did Kupper. Over and over he had been warned of the line. He not only discussed with his co-worker the possibility of electrocution, but moments before the accident jokingly told another person the electrocution would befall his co-worker, not himself.
It is questionable whether Kupper had any real control over Kent's situation. His primary job was to see the work being done by the contractor fulfilled specifications. Kent was not working for Kupper but for Barber Brothers. Barber Brothers had supervisory personnel on the job under whom Kent performed his duties. Kupper was required to observe the entire project not just the scratching operation. He was not in the immediate area when the accident happened. The technique employed by Kent and Jenkins in the vicinity of the power lines was voluntary on their part. If Kupper had any right of control over Kent's situation, it was subordinate to Kent's control of the specific manner in which his assignment was carried out.
It cannot be seriously contended Kent's conduct was involuntary. Nothing in the record suggests he would have gotten in trouble with his employer or jeopardized his employment had he used alternative methods of scratching the slab while near the power lines. There was ample time to bring over a bench and use it. Or, as pointed out by witnesses, he was a short distance from the end of the slab and could have walked the rake and pole to the other side. These were safe alternatives but Kent chose to ignore the many warnings and expose himself to the known, obvious danger. Under the circumstances attendant to the then existing work situation Kent had as much, if not more, ability to eliminate the danger as did Kupper.
We are aware Kent may have stumbled as he raised the pole. And, we acknowledge where there are no eyewitnesses and the plaintiff, as here, is unable to testify how the accident occurred, it is presumed he acted with ordinary care. These concerns are answered by the evidence. A reasonable person would have been aware of the distinct possibility of stumbling in uneven terrain while attempting to control a device having the physical characteristics possessed by the scratching device. Losing one's stability under those circumstances was a foreseeable event of which a reasonably prudent person would have been aware. The possibility of Kent having stumbled does not raise his conduct to that degree of care which we might reasonably expect a person to exercise for his own safety and protection.
With respect to the presumption, we conclude there were eyewitnesses to the accident. What was seen and heard by several witnesses is tantamount to a full explanation *568 of how the accident occurred. The conclusion is inescapable. Kent raised the pole while dangerously close to the high voltage lines. One may speculate whether Kent failed to control the pole due to stumbling or due to its physical characteristics, whether he misjudged the distance involved, or whether he momentarily lost sight of the line. In any event, we know from the evidence the pole was in Kent's hand moments before the accident, it was seen at the moment of contact, it was seen falling, and Kent was seen slumping to the ground. It may not be clear why the pole made contact but witnesses to the accident establish beyond doubt Kent raised it while very close to the line. From a purely logistical view point, the length of the pole, the height of the line, and the point of contact placed Kent almost directly under the distribution facilities. Even if we were to find there were no eyewitnesses to the accident, the presumption Kent acted with ordinary care has been rebutted by substantial evidence.
We conclude Kent's conduct was not that of a reasonable person; it did not conform to the standard required for his self-protection. He was contributorily negligent and as a matter of law is denied recovery from Kupper and Kupper's employer, the State of Louisiana.
Turning to Gulf States, we must test the defenses asserted against the theories of liability for which instructions were given by the trial court. After stating a different standard of care applied to Gulf States, the trial court proceeded to instruct the jury with respect to three distinct bases for liability. Each of these concerns an activity in which Gulf State may be said to have been involved and which under varying circumstances produces legal fault. They are: custody of a thing presenting an unreasonable risk of harm (strict liability under La. C.C. art. 2317); maintaining a potentially dangerous facility requiring a high degree of care (negligence under La.C.C. art. 2315); and, engaging in an ultrahazardous activity (strict liability without proof of negligence under La.C.C. art. 2315).
It is arguable whether the facts of this case justify giving to a jury the question of whether the high voltage line entailed an unreasonable risk of harm. The initial decision of whether a thing poses an unreasonable risk of harm is one of law for the court to make and must be based upon the court's appreciation of whether reasonable minds can differ on the point. If the court believes the thing does present an unreasonable risk of harm, or that reasonable minds could differ, only then is it appropriate to instruct the jury on the law set forth in Article 2317 of our Civil Code. Even in this instance, the jury should be cautioned that if it finds the thing does not pose an unreasonable risk of harm, negligence must be proved in order to permit recovery. Adequate guidelines are set forth in the case of Loescher v. Parr, 324 So.2d 441 (La.1976).
It is also arguable if a proper question for the jury was whether the activity of Gulf States was an ultrahazardous undertaking. Again, the initial decision is one of law and the approach discussed above should be employed. Guidelines for this area of concern are found in Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971).
Prior jurisprudence has treated electrocution accidents as negligence cases falling within the purview of Article 2315 of our Civil Code and subject to the defense of contributory negligence. See Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La.1976); Simon v. Southwest Louisiana Electric Membership Corporation, 380 So.2d 1242, 1245 (La.App. 3d Cir. 1980); McKowen v. Gulf States Utilities Co., 358 So.2d 675 (La.App. 1st Cir. 1978); Boure v. New Orleans Public Service, Inc., 255 So.2d 776 (La.App. 4th Cir. 1971), writ refused, 260 La. 857, 257 So.2d 432. The duty imposed by these authorities upon those who operate high voltage electrical lines is one requiring the exercise of "utmost care," "a high degree of care," "the highest degree of care." The trial court in this case spoke simply of "a high degree of care." We hold, regardless of the verbiage, and for the *569 reasons detailed in our discussion relative to Kupper and the State, the conduct of Keith Kent nullified any possible liability of Gulf States because of omissions or commissions constituting a violation of its legal duty. In short, Kent did not exercise that degree of care one might reasonably expect a person to exercise for his own safety and protection. Viewed objectively, his actions equate to contributory negligence. Gulf States carried the burden of proving this defense by a clear preponderance of the evidence.
To escape liability for injury caused by a thing presenting an unreasonable risk of harm (La.C.C. art. 2317), the owner or guardian having custody of the thing must show the injury was caused by the fault of the victim, by the fault of a third person, or by an irresistible force. Loescher, supra. See also Holland v. Buckley, 305 So.2d 113 (La.1974); Turner v. Bucher, 308 So.2d 270 (La.1975). In this regard, we need address only the question of whether Kent's injuries were caused by his own fault.
Jurisprudential standards for what constitutes victim fault sufficient to relieve a defendant of liability under Article 2317 are in a developmental stage. Loescher tells us fault of the victim must be a substantial fact in bringing about the harm producing incident. This court, in American Road Insurance Company v. Montgomery, 354 So.2d 656 (La.App. 1st Cir. 1978), writ denied, 356 So.2d 430, 434, 435 (La.1978), equated "substantial factor" with "cause in fact." Under the facts of Daniel v. Cambridge Mutual Fire Insurance Company, 368 So.2d 810 (La.App. 2d Cir. 1979), writ denied, 369 So.2d 1063, the court concluded: "Defendant is exculpated from fault and liability by the fault of the victim, that is, her assumption of risk." A writ denial in Hebert v. Maryland Casualty Company, 369 So.2d 708 (La.1979), elicited these comments from Justice Tate:
"[T]he fault of the victim that defeats recovery for harm occasioned by strict liability imposable upon a defendant involves a voluntary exposure to the risk with full knowledge and appreciation of the danger. Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133, 140-141. The trier of fact could properly have found that the plaintiff, an experienced horsewoman, had so assumed the risk.
"Although the language of the court of appeal incorrectly suggests that the objective test of contributory negligence rather than the subjective test of assumption of the risk defeats a recovery based on strict liability, the result is correct. See Daniel v. Cambridge Mutual Fire Insurance Co., 368 So.2d 810 (La.App. 2nd Cir. 1979) in which writs were denied this day, for a correct statement of the principles involved."
For purposes of this decision, we need not look beyond the principle that where the facts of a case prove plaintiff fully understood the danger which was involved and then voluntarily exposed himself to the danger, he is guilty of victim fault precluding recovery. In plain language, facts which establish the defense of assumption of risk are always sufficient to establish the defense of victim fault as related to imposition of strict liability. The jury was correctly instructed in this regard.
The evidence in this case overwhelmingly proves Keith Kent fully understood the danger involved in contacting the high voltage distribution line and that he voluntarily exposed himself to the danger by raising the aluminum pole into the air while in close proximity to the line. Without repetitious detail, it suffices to say Kent before the accident discussed the danger of electrocution, acknowledged it could happen and jokingly downplayed the danger. Rejecting repeated warnings he then unnecessarily exposed himself to the danger.
Lastly, we note the defense to liability based upon the theory Gulf States was engaged in an ultrahazardous activity is, in this instance, the same defense as that applicable to liability based on custody of a thing presenting an unreasonable risk of harm. This defense is, of course, assumption of risk. Liability arising from an ultrahazardous activity (here contended to be the operation of a high voltage electrical *570 distribution line) is a form of strict liability imposed by our courts. The landmark decision of Langlois v. Allied Chemical Corporation, supra, treats this subject matter. It holds contributory negligence is not a defense in these type cases but adopts the majority view that assumption of risk is a defense. To determine if the plaintiff in Langlois assumed the risk, the court examined: (1) plaintiff's appreciation and knowledge of the risk; (2) plaintiff's ability to avoid or minimize the risk; and (3) whether plaintiff consented to encounter the risk. The court noted plaintiff was not required to surrender valuable rights and privileges because defendant's conduct threatened him but stated:
"Yet if the plaintiff could readily avoid or mitigate the damage caused by defendant's conduct and he knows how to do so, he cannot act in such a manner as to invite injury."
The court in Langlois held the determination of whether a plaintiff has assumed a risk is made by subjective inquiry, whereas contributory negligence is determined objectively under the reasonable man standard. Applying the criteria of Langlois to the actions of Keith Kent leaves no doubt as to the validity of the defense of assumption of risk. Established facts mandate inferences and conclusions fully satisfying subjective inquiry.
For these reasons, we hold the jury in this case committed manifest error in failing to find the conduct of Keith Kent bars his recovery. We reverse the judgment appealed insofar as it cast Gulf States Utilities Company for damages, legal interest and one-third of the costs. In all other respects, the judgment is affirmed. Plaintiff is assessed all costs of court.
REVERSED IN PART AND AFFIRMED IN PART.