418 So.2d 493 (1982)
Milton KENT, Jr., As Curator of the Estate of his Interdicted Son, Keith Kent
v.
GULF STATES UTILITIES COMPANY and the State of Louisiana Through the Department of Highways.
No. 80-C-2453.
Supreme Court of Louisiana.
April 30, 1982.
Rehearing Denied September 3, 1982.
*494 Charles R. Moore, Edward J. Walters, Jr., and Keith B. Nordyke, of Moore & Walters, Baton Rouge, for plaintiff-applicant.
Frank W. Middleton, Jr., and W. Luther Wilson, of Taylor, Porter, Brooks & Phillips, William J. Doran, Jr., Robert J. Jones, Marshall W. Wroten, and Philip K. Jones, of Doran & Kivett, Baton Rouge, for defendants-respondents.
LEMMON, Justice.
This case of personal injury by contact with electrical lines involves an analysis of the respective duties and conduct of the electric utility company, of the executive officers of the construction company which was building a road that crossed under the electric lines, of the executive officers of the State Department of Highways, and of the electrocution victim who was a construction worker on the project.
The accident occurred when Keith Kent, an employee of Barber Brothers Contracting Company, was working on a highway department project to widen a roadway in the Baton Rouge area. The 30-foot aluminum pole he was using to texture the surface of the highway came in contact with a high voltage distribution line owned by Gulf States Utilities. Named as original defendants were Gulf States Utilities Company *495 and the State of Louisiana Department of Highways. After the trial court determined plaintiff's exclusive remedy against the Department was for workmen's compensation benefits and dismissed that defendant, plaintiff named the Department's project engineer, W. L. Landon, Jr., and their project inspector, Killiam H. Kupper, as individual defendants. Also named defendants in their individual capacities were Barber's two executive officers.
After presentation of the evidence and closing arguments to the jury, the Barber defendants reached a settlement with plaintiff. The trial court's charge to the jury included instructions on the liability of the Barber defendants, and the jury returned a verdict in favor of plaintiff against Gulf States Utilities and Barber's two officers for $3,000,000. The trial court entered judgment following the verdict against Gulf States Utilities for $1,000,000, plus legal interest and one-third of the costs, as its share of the judgment. All other defendants were dismissed.
Plaintiff appealed, seeking reversal of the dismissal of Landon and Kupper and of the trial court's reduction of the judgment by two-thirds.[1] Defendant Gulf States also appealed, reurging the defenses of contributory negligence and/or assumption of risk. The court of appeal held that Keith Kent's conduct barred his recovery and reversed the judgment against Gulf States, while affirming the dismissal of all other defendants. 398 So.2d 560. We granted plaintiff's application for certiorari. 399 So.2d 585.
Facts
Keith Kent began his employment with Barber shortly before the accident. At the time of his injury the 18-year old employee was making antihydroplaning grooves in the surface of the highway by pulling a metal rake, approximately five feet wide, across the surface of the freshly poured concrete.
The portion of the highway then under construction ran under three high voltage distribution lines, which intersected the highway at an angle. The uninsulated lines, located 25 feet 8 inches above the surface of the ground and 24 feet 8 inches above the surface of the slab, were clearly visible, and everyone on the construction site, including Keith Kent, was aware of them.
The metal rake used by the workers to create grooves had an aluminum handle, which had been extended to a length of 30 feet by screwing together several six-foot sections. That length was necessary because of the double width of the concrete roadway (two 13-foot widths) under construction.[2]
On the day of the accident Kent and his co-worker, David Jenkins, were using a walk bench bridge (a structure on wheels which straddled the slab) to transfer the rake from one side of the poured concrete to the other. The workers, after pulling the rake across the concrete, used the bench to slide the rake back across the slab to make the next pull. However, about two hours before the accident, a crew of Barber's concrete finishers needed the bench, and Kent and Jenkins relinquished it. They first tried to simply push the rake across and pull it back, but that procedure caused gouging. They then began using the "flip-flop" method to transfer the rake back and forth across the slab.[3] In using this method, *496 Kent stood on one side of the slab and pulled the rake, creating the grooves across the concrete. He then returned the rake by holding onto the rake head, raising the handle in the air and letting the rake fall across the slab, where it was caught by Jenkins. Jenkins then pulled the rake across the surface and returned it to Kent in a similar manner.
Kent and Jenkins used this method until they came near the overhead lines. To avoid contact, they devised a method to walk away from the lines, to flip the rake, and then to return under the lines to rake across the surface. Kent and Jenkins had used this method without incident to work underneath and beyond the lines approximately eight or ten feet when the accident occurred.
None of the witnesses who testified at trial actually saw the rake handle contact the wire. David Jenkins testified that he and Kent had completed two pulls after crossing under the wires and that Kent was standing eight to ten feet from the point the wires intersected the highway at an angle. Suddenly "he [Kent] just went up in the air with it [the rake handle]". Jenkins described the handle as limber and wobbly.
Charles Smith, a cement finisher, testified that he walked over to Kent just before the accident to warn him of the lines. He stated that when he tapped Kent on the shoulder and pointed out the lines, Kent indicated he was aware of them and joked with Smith that the wires would get Jenkins, but not him. Smith testified he turned and walked about 20 feet when he heard the electrical boom caused by the handle's contact with the wire, and then he saw Kent slumped over motionless next to the slab.
It is therefore evident from the testimony that the accident occurred when Kent, while standing very near the overhead lines, raised the rake handle so that it made contact with one of the lines.
Liability of Gulf States
Plaintiff contends that Gulf States was negligent in failing to take reasonable measures to protect against the foreseeable risk that a person, in contact with the ground or with a grounded object, would come in contact with its wires in the construction area. Plaintiff further urges that we hold Gulf States under some form of absolute or strict liability, either as the custodian of a thing under C.C. Art. 2317 or as an enterpriser engaged in an ultrahazardous activity.
C.C. Art. 2315 imposes delictual liability on a person whose fault causes damage to another. Since "fault" is a broader and more comprehensive term than "negligence", the codal scheme imposes responsibility on a person not only when his negligence causes damage, but also when the person has a legal relationship with a person, a thing, or an activity which causes damage. Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971). Liability is strict in the sense that it does not depend upon proof of personal negligence.[4]
C.C. Art. 2317 provides:
"We are responsible, not only for the damages occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
In Loescher v. Parr, 324 So.2d 441, 444 (La.1975), this court interpreted Art. 2317 as imposing liability on the owner of a diseased tree which fell onto a neighbor's automobile, although the diseased condition of the tree was not apparent and the owner therefore could not be deemed negligent for failing to discover and correct the condition *497 or to protect others from the risk resulting from that defective condition. The court held that the tree's owner-guardian was liable for his fault in maintaining a defective tree and not preventing the thing from causing injury, unless he proved that the damage was caused by the fault of the victim, by the fault of a third person, or by an irresistible force.
Because the term "thing" encompasses a virtually unlimited range of subject matter, the Loescher decision has since been cited by innumerable litigants seeking to avoid the necessity of proving personal negligence in tort cases. The distinction between negligence cases and strict liability cases (such as Loescher) has largely been either misunderstood or completely disregarded. It is therefore appropriate for this court, in determining the applicability of Art. 2317, to review first the distinguishing effect of applying strict liability under that article.
In a typical negligence case against the owner of a thing (such as a tree) which is actively involved in the causation of injury, the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in the damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk, and no responsibility is placed on the owner who acted reasonably but nevertheless failed to discover that the thing presented an unreasonable risk of harm.
In a strict liability case against the same owner, the claimant is relieved only of proving that the owner knew or should have known of the risk involved. The claimant must still prove that under the circumstances the thing presented an unreasonable risk of harm which resulted in the damage (or must prove, as some decisions have characterized this element of proof, that the thing was defective). The resulting liability is strict in the sense that the owner's duty to protect against injurious consequences resulting from the risk does not depend on actual or constructive knowledge of the risk, the factor which usually gives rise to a duty under negligence concepts. Under strict liability concepts, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. If the owner breaches that absolute duty to discover, he is presumed to have discovered any risks presented by the thing in custody, and the owner accordingly will be held liable for failing to take steps to prevent injury resulting because the thing in his custody presented an unreasonable risk of injury to another.[5]
Thus, while the basis for determining the existence of the duty (to take reasonable steps to prevent injury as a result of the thing's presenting an unreasonable risk of harm) is different in C.C. Art. 2317 strict liability cases and in ordinary negligence cases, the duty which arises is the same. The extent of the duty (and the resulting degree of care necessary to fulfill the duty) depends upon the particular facts and circumstances of each case.
Accordingly, in a strict liability case in which the claimant asserts that the owner's damage-causing thing presented an unreasonable risk of harm, the standard for determining liability is to presume the owner's knowledge of the risk presented by the thing under his control and then to determine the reasonableness (according to traditional notions of blameworthiness) of the owner's conduct, in the light of that presumed knowledge.
Thus, in the Loescher case, the plaintiff did not have to prove the owner of the tree *498 knew or should have known of the defect in the tree. Under strict liability concepts the owner was presumed to have knowledge of the tree's condition, and he was liable because a reasonable owner who had discovered the hazardous condition would not have maintained the thing as he did without correcting or minimizing the risk. As some torts scholars have observed, the test in strict liability cases, except for the element of the defendant's scienter, is virtually the same as that for negligence. See J. Wade, Strict Tort Liability for Manufacturers, 19 S.W.L.J. 5,15 (1965).[6]
In the present case Gulf States knew that its lines were "hot" and were not wrapped with insulating material, a condition which presents a grave risk of harm to a person who comes in close proximity to the lines while in contact with the ground or a grounded object. (This risk was indeed a cause-in-fact of Kent's injury in this case.) Because of Gulf States' knowledge of the condition of its lines, it is unnecessary in this case to presume any knowledge of a risk of harm created by Gulf States' lines in this case, and C.C. Art. 2317's imposition of an absolute duty to discover the risks presented by the thing in its custody is not helpful to the determination of Gulf States' liability in this case. That liability as custodian of the thing depends on an analysis of the reasonableness of Gulf States' conduct in protecting persons against harm resulting from the risk of which Gulf States was well aware, which is essentially a negligence determination.
Liability for ultrahazardous activities, on the other hand, involves different considerations than liability under C.C. Art. 2317 for creating or maintaining a thing which presents an unreasonable risk of harm. There are some activities in which the risk may be altogether reasonable and still high enough that the party ought not undertake the activity without assuming the consequences. Such activities include pile driving, storage of toxic gas, blasting with explosives, crop dusting with airplanes, and the like, in which the activity can cause injury to others, even when conducted with the greatest prudence and care.[7] 2 F. Harper and F. James, The Law of Torts, § 14.4 (1956); W. Prosser, The Law of Torts § 78 (4th ed. 1971).
For these particular activities, Louisiana courts have imposed an absolute liability (as contrasted to the strict liability previously discussed), which virtually makes the enterpriser an insurer. The enterpriser, whether or not negligent in any respect, causes the damage, and the injured party recovers simply by proving damage and causation.
In these cases of absolute liability (or liability without proof of negligence or other fault), liability is imposed as a matter of policy when harm results from the risks inherent in the nature of the activity. The steps taken by the enterpriser to protect others from the inherent risks of the activity are not relevant to the determination of liability.
The activity of driving piles, for example, is likely to cause damage, even when there is no substandard conduct on anyone's part. The activity, by its very nature, simply cannot be done without a high degree of risk of injury.
On the other hand, the transmission of electricity over isolated high tension power *499 lines is an everyday occurrence in every parish in this state and can be done without a high degree of risk of injury. And when the activity results in injury, it is almost always because of substandard conduct on the part of either the utility, the victim or a third party.[8]
The two activities of driving piles and of transmitting electricity are thus different from the point of view of a policy need to impose absolute liability irrespective of negligence or other fault. Indeed, we have not been directed to any decision from other states in which absolute liability has been imposed on the activity of transmitting electricity for public consumption. See 82 A.L.R.3d 218 (1978).
We accordingly conclude that Gulf States should not be held absolutely liable, as an enterpriser engaged in ultrahazardous activities, when its activity of transmitting electricity is a cause-in-fact of injury to another, unless fault was proved on Gulf States' part.
We now turn to the bottom line for resolving the issue of Gulf States' liability in this case and determine whether Gulf States took reasonable steps under the circumstances to protect against the risk that a person, in contact with the ground or with a grounded object, would come in contact with its electric lines in the construction area.
Pointing out the provision in the National Electric Safety Code for a minimum vertical clearance of 20 feet over roads in urban and rural areas, Gulf States contends that its lines were "insulated by isolation", in that the lines were sufficiently isolated that contact was neither foreseeable nor likely. On the other hand, plaintiff contends that the construction activity in the vicinity of the lines and the use of 30-foot metal poles in that construction constitutes special circumstances which increased the hazard and dictated special precautions to reduce the risk. Plaintiff argues that Gulf States could have installed temporary insulation or taken other simple protective measures, and should be held liable for failing to take any additional steps to reduce the risk.
The determination of the responsibility for the accident involves an analysis and comparison of the respective duties and the responsive conduct of all parties, not only Gulf States and Kent, but also Barber's executives and the Highway Department's executives. Each had some duty in some degree to prevent the type of accident which did occur, and the conduct of each must be examined and compared in the light of the respective duties.
The road construction project crossed under Gulf States' wires at about 18 different points. Representatives of Gulf States, Barber and the Highway Department attended numerous meetings pertaining to the project, and in fact Gulf States moved its poles at this particular crossing to accommodate the construction.
Except for the rakes, there was no other equipment or machines on the project that were long enough or tall enough to present a danger of contact with the wires. Barber had fiberglass handles, but nevertheless supplied aluminum handles for this job.[9]
A combination of unusual factors concurred to cause this accident. The breaking down of the road machine caused the need to use the rake over an unusually long distance and period of time. The double width of the roadway caused the need to use an exceptionally long handle. The appropriation of the bench to another use caused the need to utilize the flip-flop method (which the Barber executives and others testified they had never seen used *500 with such a long handle). The progress of the grooving to the point of intersection with the wires caused the need to devise an alternative method of procedure under the wires. Finally, Kent's act of raising the handle into wires he had just been warned to avoid was necessary to complete the unfortunate scenario.[10]
Under the overall circumstances, it is difficult to conclude that Gulf States acted unreasonably in failing to protect against these particular consequences. Gulf States' conduct at issue in this case is its decision not to take additional precautions (such as installing rubber hose in the area of construction) beyond the precaution of insulating its lines by isolation, which was done in the original construction of the lines. We find that conduct not to be unreasonable. Furthermore, we find no ease of association between the risk presented by Gulf States' conduct under the overall circumstances and the injury which ultimately occurred. Hill v. Lundin & Assoc., Inc., 260 La. 542, 256 So.2d 620 (1972).
Liability of Kupper
Plaintiff contends that Kupper was in charge of the grooving project and, although aware of the wire, did not insure that Kent used proper tools and used a safe method to perform his work.
The duty to provide Kent with a safe place to work, including proper tools, equipment and methods for safely performing his duties, was primarily on his employer and the employer's executive officers. Kupper arguably could have prevented the accident by interjecting himself and demanding that Barber furnish Kent with a fiberglass rake, but he had no such duty to Kent, and is not liable for failing to do so. Furthermore, Kupper did not affirmatively create a hazardous situation by requiring Kent to use dangerous equipment or methods.
The judgment of the court of appeal is affirmed.
DIXON, C. J., concurs.
MARCUS, J., concurs and assigns reasons.
DENNIS, J., assigns additional concuring reasons.
WATSON, J., dissents and assigns reasons.
MARCUS, Justice (concurring).
I do not consider that Gulf States is strictly liable under La.Civ.Code art. 2317 because there was no evidence of a defect in the overhead electric lines. Moreover, there is ample evidence of "victim fault." Likewise, I agree that Gulf States should not be held absolutely liable as one engaged in ultra-hazardous activities. Also, I find no negligence on the part of Gulf States under La.Civ.Code arts. 2315 and 2316. Additionally, I consider that plaintiff was either contributorily negligent and/or assumed the risk of injury.
Accordingly, I respectfully concur.
*501 DENNIS, Justice, assigning additional concurring reasons.
I join in the majority opinion. Furthermore, in support of its thoughtful observations, I feel the following comments should be added.
I am convinced that this court in Loescher v. Parr, 324 So.2d 441 (La.1975), through use of the phrase "unreasonable risk of injury," intended to inject into the theory of liability under Article 2317, a balancing test closely analogous to that utilized in negligence actions.
The "unreasonable risk of injury" phrase is strikingly similar to language employed by many American courts, scholars, and law reform bodies in dealing with ordinary negligence and products liability law. See W. Prosser, Law of Torts § 31 (4th ed. 1971); Restatement of Torts §§ 282 and 402A. The history of strict products liability in Louisiana indicates the requirement that a defective product must be "unreasonably dangerous" came into our jurisprudence due to the pervasive influence of section 402A of the Restatement of Torts after its publication in 1965. DeBattista v. Argonaut-Southwest Ins., 403 So.2d 26 (La.1981); Weber v. F. & C. Co., 259 La. 599, 250 So.2d 754 (1971). See Andrus, 25 La.B.J. 105 (1977); Robertson, 50 Tul.L.Rev. 50 (1975). After using the "unreasonably dangerous" limitation in Weber v. F. & C. Co. as a condition to legal fault under Article 2315, the Louisiana Supreme Court employed a similar requirement in summarizing the principles of legal fault under Articles 2317, 2318, 2320, 2321 and 2322, by holding that strict liability results from the conduct or defect of a person or thing which creates an "unreasonable risk" of injury to others. Loescher v. Parr, supra.
All of these "unreasonable risk" tests imply a process of balancing the risk against the value of the interest which the defendant is seeking to protect, and the expedience of the course pursued. Prosser, at p. 149. This is the standard negligence test. In strict liability, except for the element of the defendant's knowledge, the test is the same as that for negligence. Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825, 834-35 (1973); Wade, Strict Tort Liability for Manufacturers, 19 S.W.L.J. 5, 15 (1965). Compare, Comment, Does Louisiana Really Have Strict Liability Under Civil Code Articles 2317, 2318, and 2321?, 40 La.L.Rev. 207 (1979). In negligence, allowance is made for the risk apparent to the actor, for his capacity to meet it, and for the circumstances under which he must act. In strict liability, however, knowledge of the condition of the product is imputed to the defendant before the balancing test or negligence test is applied. In products liability, for example, a product is considered unreasonably dangerous when a reasonable seller would not sell the product if he knew of the risks involved or if the risks are greater than a reasonable buyer would expect. Thus, assuming that the defendant had knowledge of the condition of the product, would he then have been acting unreasonably in placing it on the market? This is another way of posing the question of whether the product presents an unreasonable risk of injury. And it may be the most useful way of presenting it. See, Wade, Strict Tort Liability for Manufacturers, 19 S.W.L.J. 5 (1965).
In the future, we may come to recognize that in the strict liability of Loescher v. Parr, except for the element of the knowledge of the custodian of the thing, the test is the same as that for negligence. Thus, assuming that the custodian of the thing had knowledge of its condition, would he then have been acting reasonably by maintaining it and exposing others to it? If this comes to be understood as the most useful way of presenting the Loescher test, then this type of strict liability will retain many of the characteristics of negligence law.
The Loescher strict liability bears little analogy to the common law doctrine of strict liability for abnormally dangerous conditions and activities with which it has sometimes been compared. Dorry v. LaFleur, 399 So.2d 559 (La.1981). Under the rule of Rylands v. Fletcher, the defendant will be liable when he damages another by a thing or activity unduly dangerous and *502 inappropriate to the place where it is maintained, in the light of the character of that place and its surroundings. The conditions and activities to which the rule has been applied include water collected in quantity in a dangerous place, or allowed to percolate; explosives stored in quantity in a city; blasting and pile driving; and crop dusting, et al. Prosser, § 78, pp. 509-510. The Restatement of Torts has accepted this principle but has limited it to an "ultra hazardous activity" which "necessarily involves a risk of serious harm to the persons, land or chattels of others which cannot be eliminated by the exercise of the utmost care" and "is not a matter of common usage." Restatement of Torts, §§ 519, 520. The Loescher doctrine is much broader since it covers all things, everywhere which create an unreasonable risk of injury to others. Most of the circumstances giving rise to strict liability under Act 2317 have been neither ultrahazardous nor unnatural to the locality. See Dorry v. LaFleur, supra; Malone, Ruminations on Liability for the Acts of Things, 42 La.L.Rev. 979 (1982).
The interpretation of Loescher suggested above preserves its worthy goals while providing the trier of fact with badly needed conceptual guidance and linkage with the familiar negligence network. The plaintiff must still prove, as part of his prima facie case, that his injury resulted from a thing in the defendant's custody presenting an unreasonable risk of injury to others. At the same time, the plaintiff is relieved of the burden of proving the custodian's knowledge of the thing's defective condition.[1] Although the custodian is presumed to have scienter, his conduct in failing to prevent the injury is judged, for the most part, according to negligence concepts with which laymen, jurors, and judges are comfortable and familiar. The custodian may still exculpate himself by proving that the injury resulted from the fault of the victim, the fault of a third person, or an irresistible force.
It would seem to follow that in cases such as the instant one, where the defendant clearly knew or should have known of the risk of injury to others by the thing in its care, the imputation of scienter afforded by Loescher is irrelevant. Applying the standard negligence test, I would agree with the author of the majority opinion that the plaintiff failed to prove that the power company acted negligently in causing Mr. Kent's injuries.
Part of the majority opinion does cause some concern, however. Although the transmission of high voltage electricity over uninsulated lines is not an ultrahazardous activity in most jurisdictions, see Annotation, Applicability of Rule of Strict Liability to Injury From Electrical Current Escaping From Powerline, 82 A.L.R.3d 218 (1978), this cannot be said so convincingly in Louisiana. Arguably, the conclusion that this activity is ultrahazardous could be reached through the same process by which this court decided, in Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971), that the storage of highly poisonous gas was an ultrahazardous activity:
"We do not here establish a new standard for liability, but merely apply the standard set by law and applied repeatedly in our jurisprudence. The activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations. See Yommer v. McKenzie, 255 Md. 220, 257 A.2d 138 (1969)." 249 So.2d at 140.
*503 I find it unnecessary to contend with the argument at this time, however, because I find that the plaintiff's own fault would preclude him from recovering in this case even under a Langlois type of strict liability. Although it is a close question, as I appreciate the evidence, the plaintiff knowingly and unreasonably assumed the risk of electrocution by flip-flopping a metal pole near the defendant's power line.
WATSON, Justice, dissenting.
In view of the heavy construction activity in the vicinity, the transmission of deadly voltages of electricity over these uninsulated lines constituted an ultra-hazardous activity. Gulf States owed a high degree of care. Rasmussen v. Fitchburg Gas and Electric Light Co., 343 Mass. 515, 179 N.E.2d 907 (1962); Phelps v. Magnavox Company of Tennessee, 497 S.W.2d 898 (Tenn.App.1972); Densler v. Metropolitan Edison Company, 235 Pa.Super. 585, 345 A.2d 758 (1975); Sprague v. Commonwealth Edison Company, 59 Ill.App.3d 342, 16 Ill. Dec. 620, 375 N.E.2d 493 (1978); and Burke v. Illinois Power Co., 57 Ill.App.3d 498, 15 Ill.Dec. 670, 373 N.E.2d 1354 (1978); and McKowen v. Gulf States Utilities Co., 358 So.2d 675 (La.App. 1 Cir. 1978). Although the lines exceeded the safety code's minimum clearance by four feet, eight inches, this was insufficient. See Galloway v. Singing River Electric Power Ass'n, Inc., 247 Miss. 308, 152 So.2d 710 (1963). A dragline, which had been used at the site, also might "have got entangled" in the electric lines. (Tr. 476) Robert E. Briggs, an expert consultant in electrical engineering, testified that the hazard here could have been greatly reduced by the use of temporary insulation. According to Briggs, such an accident was "reasonably foreseeable". (Tr. 575) In Briggs' expert opinion, the National Electric Safety Code was violated by Gulf States. Gulf States had a duty to take further precautions against the risk of injury presented. McKowen, supra. The question of Gulf States' liability is a jury question. Rasmussen v. Fitchburg Gas and Electric Light Co., supra; Densler v. Metropolitan Edison Company, supra; Kirton v. Williams Electric Co-Op, Inc., 265 N.W.2d 702 (N.D., 1978); Sprague v. Commonwealth Edison Company, supra; Cantu v. Utility Dynamics Corp., 70 Ill.App.3d 620, 26 Ill.Dec. 160, 387 N.E.2d 990 (1979); Estate of Celiz and Sanchez v. Public Utility District No. 1 of Douglas County, 30 Wash. App. 682, 638 P.2d 588 (1981); and, Tirante v. Gulf States Utilities Co., et al., 412 So.2d 128 (Ct.App. 1 Cir. 1982). The jury's verdict against Gulf States should be affirmed.
The jury did not give judgment against Kupper and apparently did not believe Jenkins' testimony that Kupper instructed them to use the flip-flop method. However, it is unlikely that Kent, a new, eighteen year old employee, devised that method himself. Because the long jointed pole was "clumsy up in the air" (Tr. 465), it came in contact with the electric lines.
I respectfully dissent.
NOTES
[1] As noted by the court of appeal, plaintiff has apparently abandoned his appeal as to the dismissal of defendant Landon.
[2] There was some testimony that grooving over a straight run of concrete pouring was usually accomplished by a machine and that hand raking was generally used only at intersections or for spot patching, when use of the machine was impractical. In such situations only a short-handled rake was usually required, because of the relatively short distance over which the rake had to be pulled. On the day of the accident the grooving machine was broken, and Barber's employees had to use the long-handled rake (which Barber had on the job) to create grooves on the 26-foot wide roadway.
[3] Testimony at trial conflicted as to how Kent and Jenkins came to use the flip-flop method. David Jenkins testified at trial that defendant Kupper instructed him and Kent, when they were about 50 feet from the wires, to give the bench to the cement finishers and to use the "flip-flop" method. In a statement given approximately six months after the accident, however, Jenkins was unable to say who instructed him and Kent to use that method. Defendant Kupper, on the other hand, denied having instructed the workers to use this method. In any event Kent and Jenkins used the flip-flop method for two hours in full view of the supervisors of both Barber and the Highway Department.
[4] Compare with the cases imposing absolute liability, to be discussed below.
[5] The theory is that the owner-guardian is regarded as the risk-creator because of his relationship with the thing which presents the risk. As between him and the faultless victim injured as a result of the risk, the owner-guardian theoretically should bear the loss, because he was in the best position to discover the risk and to prevent the injury.
[6] In products liability cases, the manufacturer is presumed to know the dangerous propensities of its product and is strictly liable for injuries resulting from the product's unreasonable risk of injury in normal use. The claimant nevertheless must prove that the product presented an unreasonable risk of injury in normal use (regardless of the manufacturer's knowledge), thus in effect proving the manufacturer was negligent in placing the product in commerce with (presumed) knowledge of the danger.
[7] See Craig v. Montelepre Realty Co., 252 La. 502, 211 So.2d 627 (1968) and D'Albora v. Tulane University, 274 So.2d 825 (La.App. 4th Cir. 1973), cert. denied. La., 278 So.2d 504 and 505 (pile driving); Langlois v. Allied Chem. Corp., above (escaping gas used in manufacture of petrochemical products); Gotreaux v. Gary, 232 La. 373, 94 So.2d 293 (1957) (crop dusting by airplanes); Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845 (1955) (blasting with explosives).
[8] It is noteworthy that, in each of the activities placed in this special category by decisions of Louisiana courts, the enterpriser is almost invariably the sole cause of the damage and the victim seldom has the ability to protect himself. No decisions have placed in this category any activities in which the victim or a third person can reasonably be expected to be a contributing factor in the causation of damages with any degree of frequency.
[9] The supplying of aluminum handles and the appropriation of the bench to other use arguably supported the jury's verdict against Barber's executive officers.
[10] The author adds the following comments:

As between Kent and Barber's executives, Kent's act was less culpable. The young, inexperienced employee was supplied with an aluminum handle rake, and after the bench was removed, he had to improvise a procedure which proved to be unsafe. In comparison to Kent (and to Gulf States), the employer's executives had a heavy duty to prevent such an occurrence.
As between Gulf States and Kent, the analysis of the comparative duties and conduct is particularly difficult in a setting in which the fault of one gives rise to total liability and the fault of the other totally bars recovery. To make such an abrupt cut-off, Gulf States' duty (on which its fault is measured) must be deemed to begin at roughly the same point where Kent's duty ends, and this solution is neither practical nor conceptually possible.
Substantial justice can only be accomplished by quantifying the fault of each party and assigning proportionate responsibility for the occurrence. Since the Legislature had not yet adopted a comparative fault system when this accident occurred, and since this court has previously been disinclined to recognize this system judicially, this case must be decided under the recognized deficiencies of an all-or-nothing system.
[1] The Loescher opinion has been criticized for discarding the traditional test of blameworthiness by imposing liability upon a defendant who had neither actual nor constructive knowledge of the defective condition of the thing in his custody. See, Malone, Ruminations on Liability for the Acts of Things, 42 La.L.Rev. 979 (1982). The perceived harshness of this result may be ameliorated, to a large degree, if the doctrine of comparative negligence is found to be applicable in 2317 actions. See, 1979 La. Acts. No. 431; Plant, Comparative Negligence and Strict Tort Liability, 40 La.L.Rev. 403 (1980); Rodrigue v. Dixilyn Corp., 620 F.2d 537, 544 n. 11 (5th Cir. 1980); Daly v. General Motors Corp., 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978).