639 So.2d 476 (1994)
Shirley B. DEROUEN, et al., Plaintiffs-Appellees,
v.
Pam AUDIRSCH f/d/b/a Highland Beauty Shop and State Farm Fire & Casualty Insurance Company, Defendants-Appellants.
Shirley and Robert DEROUEN, Plaintiffs-Appellees,
v.
ST. FRANCIS MEDICAL CENTER, INC. and the Louisiana Patient's Compensation Fund, Defendants-Appellants.
Nos. 25,847-CA, 25,848-CA.
Court of Appeal of Louisiana, Second Circuit.
June 28, 1994.
*479 Moore, Walters, Shoenfelt & Thompson by Charles R. Moore and Marjorie A. McKeithen, *480 Baton Rouge, for plaintiffs-appellees Shirley and Robert DeRouen.
Fewell, Rhymes & Lucas by J. Michael Rhymes, Monroe, for defendants-appellants State Farm Ins. Co. and Pam Audirsch.
Provosty, Sadler & deLaunay by Frederick B. Alexius and John P. Doggett, Alexandria, for Louisiana Patient's Compensation Fund.
Davenport, Files & Kelly by M. Shane Craighead, Monroe, for Clyde Medaries.
Before NORRIS, VICTORY and WILLIAMS, JJ.
NORRIS, Judge.
Shirley DeRouen's consolidated claims, 25847-CA and 25848-CA, arose from an accident in defendant, Pam Audirsch's, leased beauty shop followed by negligent medical treatment for her injury at St. Francis Medical Center. The original tortfeasors, Pam Audirsch and State Farm Insurance, appeal from an adverse jury verdict, finding Audirsch at fault, and the owner of the premises, Clyde Medaries, free from fault in causing DeRouen's initial injury. They also allege that the trial court erred in omitting one of their requested jury instructions. The Louisiana Patients Compensation Fund ("Fund") appeals the verdict insofar as it apportions 70 percent of DeRouen's total damages to the health care provider. All three contest the damage awards for past and future lost earnings. The DeRouens answer the appeal, seeking an increase in certain damage awards. For the following reasons, we amend and affirm.

FACTUAL AND PROCEDURAL HISTORY
Pam Audirsch, operator of Highland Beauty Shop, entered an oral agreement with Clyde Medaries in October 1986 to lease the fully equipped salon for $200 a month. On July 1, 1987, Shirley DeRouen, then an x-ray technician at St. Francis and customer of Audirsch's, went to the salon for her hair appointment. Mrs. DeRouen sat down in a beautician's chair, its back against the counter, to await Audirsch, who was with another customer. As DeRouen turned the chair to face Audirsch and the customer, the chair back collapsed, causing her to fall backwards out of the chair onto the floor. DeRouen testified that she hit her back and head on the floor and momentarily lost consciousness; she remained at the shop for another two hours to have her hair done. She also stated that she felt soreness, stiffness and pain in her back a few hours later, which she attempted to treat herself with muscle relaxers, pain pills and a heating pad.
Several days after the accident, DeRouen made an appointment with her treating physician, Dr. Don W. Irby, a neurosurgeon. Between her fall and appointment with Dr. Irby, the pain worsened and began radiating down her leg; she also experienced pain in her hip and numbness in her toes. On July 6, Dr. Irby initially diagnosed exacerbation of her pre-existing protruding disc at the L-5/S-1 level, but a subsequent myelogram and CAT scan confirmed that the disc had ruptured. On July 24, DeRouen underwent a lumbar discectomy at St. Francis Medical Center. She awoke from this procedure unable to lift her left foot and later learned that her condition, commonly known as "drop foot," was caused by compression of the peroneal nerve by an improperly fastened leg strap during surgery.
Her foot improved slightly over the next few days; however, upon her discharge on August 1, she still suffered from incomplete peroneal nerve damage and had substantial difficulty walking because she could not control her left foot. She complied with the recommended home physical therapy for her back and walked two to three miles a day, but testified that she needed assistance to do so.
DeRouen seemed to be improving as of May 1988, according to a letter written by Dr. Irby to James McLemore, the administrative director of radiology services at St. Francis. He anticipated her return to work full-time in August 1988. In the interim, he suggested that she attempt to resume her former job, but work only part-time, and carry or lift no more than 10 pounds. He strictly limited the amount of time she could sit, stand, walk, stoop, bend and climb. Mrs. *481 DeRouen read the letter, but was concerned she would be unable to perform the job and thus lose her disability benefits, and preferred instead to return full-time in August. Dr. Irby felt that DeRouen, the person suffering from the neurological deficit, was in the better position to decide whether she could return to work or not; he agreed not to mail the letter.
DeRouen returned to Dr. Irby on February 22, 1989 complaining that she experienced a setback after a fall two weeks earlier; Dr. Irby noted that her foot injury had, in fact, worsened. He then sent her to Dr. Mulbier, a nerve specialist in Memphis, who informed her the nerve damage was permanent. DeRouen testified that she had never in her life felt more depressed than when she was told this.
DeRouen last saw Dr. Irby on January 5, 1993. He noted that she no longer had "drop foot," but still suffers from incomplete common peroneal nerve damage and her foot will never function normally. He assigned a total 23 percent partial and permanent disability rating, 15 percent for her back and eight percent for her foot. Dr. Irby did not recommend her returning to her former position at St. Francis unless she could comply with all the restrictions listed in his May 1988 letter. Otherwise, he suggested only light duty work such as a file clerk or receptionist.
DeRouen is now 50 years old (44 at the time of the accident) and must wear a leg brace to help her walk. Even with this brace, she must make a conscious effort to lift her foot. She has stumbled and fallen numerous times and constantly worries about falling. She also experiences numbness, stiffness, cramping, spasms and swelling in her foot, which negatively impacts the physical activities she was once able to enjoy. She requires help performing routine tasks, such as climbing stairs and household chores. As a result of her dependency on others, she suffers from depression, low self-esteem and decreased self-confidence. She experiences back spasms and pain and cannot sit for long periods of time. Her husband also noticed the deleterious effects both injuries had on his wife and on their marriage.
The DeRouens filed suit against Pam Audirsch d/b/a Highland Beauty Shop and State Farm Insurance in June 1988 and against St. Francis Medical Center in October 1989. The defendants in the first action brought a third-party demand against Clyde Medaries and St. Francis. In the second action, St. Francis filed a third-party demand against Audirsch and State Farm. The actions were consolidated in November 1989. In June 1990, the plaintiffs settled with St. Francis, which conceded liability, for $100,000, and reserved their rights to proceed against the Fund for excess damages.[1] The remaining parties proceeded to jury trial in January 1993.
Defendants, Audirsch and State Farm, sent Mrs. DeRouen to Vernon Moss, an occupational therapist, for a functional capacity assessment on September 1 and 2, 1992. DeRouen performed poorly in 23 out of 29 tested physical activities. Moss testified that DeRouen was capable of only sedentary work, which he conceded was basically just sitting somewhere. In light of her diminished physical ability, Moss admitted she was incapable of performing aspects of her job "where speed in walking and mobility is critical," such as reacting to an emergency and preventing a faint or weak patient from falling. 25847-CA, Vol. IIK, p. 780. Finally, he recommended treatment for muscle weakness, help with coping skills and a work fitness program.
Audirsch and State Farm also hired Louis Lipinski, a vocational rehabilitation counselor, to conduct a labor market survey. Lipinski testified on direct examination that he found there was a demand for x-ray technicians, even with DeRouen's disability, and that employers were willing to make accommodations for qualified disabled individuals. He also stated that he discussed the case with rehab professionals from the Job Accommodations Network, a telephone service for disabled persons. He was told that most hospitals provide assistants to transfer and position patients, stools for those who cannot *482 stand for long periods of time, and lifts and other devices to transfer patients to gurneys from beds. Not only did Monroe have a job market for Mrs. DeRouen with her limitations, but, according to Lipinski, she would be able to earn at least $14 an hour and possibly as high as $25 an hour. In addition, he testified that he found a market for non-typing clerical positions, such as administrative, file, ward or medical records clerk at five to six dollars an hour. On cross exam, however, he reluctantly admitted that not one of the 32 clinics and centers surveyed in his report had x-ray tech or clerical positions available. Exh. P-17.
On direct exam, Lipinski also insisted that the Americans With Disabilities Act ("ADA"), enacted only recently in July 1992, would prevent employers from denying her jobs because it mandates that employers hire and make reasonable accommodations for disabled persons. Nevertheless on cross exam, he admitted the effect of that legislation would not be immediate. Moreover, he testified that the ADA did not require employers to hire a disabled individual, but only required them to consider that person. He further conceded that the act did not require employers to hire a disabled person, such as DeRouen, who posed a direct threat to the health and safety of patients.
Finally, Lipinski's credibility was damaged on rebuttal. Though he testified that he called various hospitals, identified himself and explained Mrs. DeRouen's situation, rebuttal witness, Dot Tolar, chief x-ray technician at E.A. Conway Hospital, testified that he never mentioned physical disabilities in connection with his questions during their telephone conversation. She also denied informing him that the hospital would accommodate a person with physical limitations.
DeRouen's supervisor, James McLemore, also testified on behalf of defendants. McLemore stated that he would have allowed Mrs. DeRouen to return to her former job and made the necessary accommodations for the physical limitations noted by Dr. Irby, if she had asked. According to McLemore, neither Dr. Irby nor Mrs. DeRouen called about her position. He was unable to recall a telephone conversation, documented by Dr. Irby in April 1988, regarding the possibility of her returning to work.
DeRouen testified that she is no longer capable of performing her essential duties as an x-ray technician. According to DeRouen, her responsibilities included lifting patients, heavy cassettes and machines, standing for long periods of time, bending, stooping, wearing a heavy lead apron, and being able to act quickly in emergency situations for the patients' safety. Mr. DeRouen, who observed his wife daily, testified that she was having difficulty performing even simple chores around the house. In any event, DeRouen stated that she was never told her job was still available or that accommodations would be made for her. In fact, Mr. DeRouen testified that hospital personnel would not speak to them when they tried to reach them by telephone or return their calls. In February 1992, she submitted an application to her friend, Jerry Stewart, owner of Heritage Personnel Service in Monroe; Stewart was unable to find her a job. At the time of trial, DeRouen had not worked since her accident.

JURY VERDICT
The jury found Pam Audirsch 100 percent at fault in causing DeRouen's original injury under both negligence and strict liability theories, and absolved Clyde Medaries of any fault. It awarded the following damages:

Mrs. DeRouen
Medical expenses (uncontested) $ 14,811.38
Past lost wages $236,476.00
Future earning capacity $150,000.00
Physical injury, pain, suffering
and mental anguish $150,000.00
Permanent disability $ 50,000.00
Mr. DeRouen
Loss of consortium $ 500.00

The jury then assessed 70 percent of the total damages against St. Francis and the Fund for the hospital's admitted liability.[2] *483 Thereafter, a consolidated judgment was rendered in favor of the DeRouens and against Audirsch and State Farm for plaintiffs' total damages. Judgment was entered in favor of plaintiffs and against the Fund (liable in solido with Audirsch and State Farm) for 70 percent of the medical expenses incurred after DeRouen's back surgery (70 percent of $5,370.67) and the remaining damages (70 percent of $586,976), less a credit of $100,000. The judgment dismissed the third party demand against Clyde Medaries with prejudice. Judgment was also rendered in favor of Audirsch and State Farm, ordering the Fund to indemnify them to the extent that the judgment against them reflects sums for which the Fund had been adjudged liable to the DeRouens. Audirsch, State Farm and the Fund appealed. The DeRouens filed an answer to the appeal, requesting an increase in certain damage awards.

DISCUSSION

I. LIABILITY

Strict LiabilityLa.C.C. art. 2317
Audirsch and State Farm contend that the jury committed manifest error in failing to find third party defendant, Clyde Medaries, strictly liable for DeRouen's injuries.
To recover under La.C.C. art. 2317, a plaintiff must prove: (1) the thing was defective and created an unreasonable risk of harm; (2) the damages were caused by that defective thing; and (3) the thing was in the defendant's custody. Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987).
C.C. art. 2317 imposes strict liability on the person maintaining custody (garde) of the defective thing; this rule is premised on one's legal responsibility to keep his thing in good condition to avoid harming others. King v. Louviere, 543 So.2d 1327 (La.1989); Loescher v. Parr, 324 So.2d 441 (La.1975). As a general rule, the guardian of the thing is in a better position than the innocent victim to detect, evaluate and take steps to eliminate the unreasonable risk of harm arising from a defective thing. Kent v. Gulf States Utilities Co., 418 So.2d 493, 497 n. 5 (La.1982). In King, our Supreme Court reiterated the longstanding principle that "[t]he things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them." King, supra at 1329; Loescher v. Parr, 324 So.2d 441, 449 (La.1975), quoting Verlander, We Are Responsible ..., 2 Tulane Civil Law Forum, No. 2, p. 64 (1974).
Ownership, in many cases, establishes the requisite benefit, control and authority to find garde; however, the two are not synonymous. Fonseca v. Marlin Marine Corp., 410 So.2d 674 (La.1981); Loescher, supra. Ownership creates only a presumption of garde, which is rebuttable by the owner. Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461 (La.1991). As noted by our Supreme Court, to find otherwise would impermissibly rewrite article 2317 as it stands today, to impose strict liability based on "ownership," as in C.C. articles 2321 and 2322, rather than on "custody" of a defective thing. Doughty, supra. In Doughty, the Supreme Court clearly rejected a finding of garde based on a wife's community ownership interest in certain defective equipment because she, in fact, had no control or authority over the equipment. Doughty, supra at 465. Based on the foregoing, it is clear that the strict liability contemplated by article 2317 arises out of "custody" of a thing, not "ownership."
Whether the law imposes a duty of garde upon Audirsch is a factual inquiry. Doughty, 576 So.2d at 464, King, 543 So.2d at 1330, Kent, 418 So.2d at 497. We must therefore determine (1) what type of direction and control Audirsch maintained over the chair and (2) whether she received any benefit from it. Doughty, supra. A jury's factual findings are entitled to great weight and will not be overturned absent manifest or clear error. Stobart v. State, Through Dept. of Transp. & Dev., 617 So.2d 880 (La. 1993).
*484 The jury embraced one permissible view of the evidence. Medaries bought the chair at Audirsch's request and for her ultimate benefit because she wanted to add an operator and needed an additional chair. He inspected both the hydraulic unit and the back of the chair twice, once when he bought it and then again at the beauty shop; both times, he found that the chair was working properly and was not defective in the manner in which plaintiff was injured. Medaries then placed the chair in the salon.
Thereafter, Medaries virtually relinquished control over the chair and had no further contact with it. There was evidence that he had repaired specific things in the past at Audirsch's request, but he was never notified that this chair needed repairs; Audirsch confirmed this. Though she and Katherine Cagle, another operator, testified that the chair was broken since the first day in the salon, Audirsch admitted that she did not advise Medaries of any problem, but used the chair in the salon for possibly as long as five months. During this time, she could have either removed it herself or asked Medaries to do so, but instead she pushed it against the wall to support the back on the day of the accident.
Medaries denied that he ever agreed to "maintain" the equipment in the salon; he admits to merely making occasional repairs at Audirsch's request. Both Audirsch and her husband testified at trial to Medaries's alleged maintenance agreement; however, Mr. Audirsch admitted that in deposition he stated that they had not agreed to any additional terms besides the rent. The record shows that it was mutually understood that the beauty shop was Audirsch's business. Medaries purposely did not visit the salon often because he did not want to "interfere with their operation of their business." Medaries Dep., p. 18. Furthermore, the chair was in his possession for an inconsequential amount of time, simply long enough to transport the chair to Audirsch, in compliance with her direct request. Cf. Franklin v. Ford Motor Corp., 617 So.2d 57 (La.App. 4th Cir.1993); Ellison v. Conoco, Inc., 950 F.2d 1196 (5th Cir.1992).
Finally, it is obvious that Audirsch received a direct and substantial benefit from leasing a fully equipped beauty shop for only $200 a month, using that equipment daily and having an additional chair installed for another operator. In contrast, Medaries merely received the fixed monthly rent and would not have benefitted greatly from Audirsch adding an operator.
The jury was not clearly wrong to find that the chair was not defective when Medaries placed it in the shop, and that Audirsch, not Medaries, actually had control and exercised authority over the defective chair and received substantial benefit as well. On this record, it was not manifestly erroneous for the jury to conclude that Medaries successfully rebutted the presumption that he had garde of the chair. Though Medaries owned the premises, he was in no better position than an innocent victim to detect, evaluate or take steps to eliminate an unreasonable risk of harm arising from the defective chair. Doughty, supra. The jury's finding that Audirsch, and not Medaries, is strictly liable for DeRouen's injury is affirmed.

Negligence
Audirsch contends that the jury erred in finding her negligent and failing to find any negligence on the part of Medaries. We disagree. Under a duty-risk analysis, Audirsch, as operator of the beauty salon, owed a duty to protect her customers against potential harm from a chair that she knew was dangerous. La.C.C. art. 2315; Roberts v. Benoit, 605 So.2d 1032 (La.1992); Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Carr v. City of New Orleans, 626 So.2d 374 (La.App. 4th Cir.1993). However, Audirsch breached that duty to DeRouen. Audirsch knew of the chair's dangerous condition, but took no steps to remedy it. Moreover, on the day in question, she failed to warn DeRouen that the chair was broken and allowed her to sit in it. In fact, Audirsch admitted that she had never warned any customer to avoid using the chair. Finally, as noted above, the jury could have easily believed that Medaries had no knowledge that the chair was not working properly. Clearly, the *485 risk that DeRouen, a customer in her shop, would be injured while sitting in the defective chair fell within the scope of Audirsch's duty. On this record, the jury was not clearly wrong in finding Audirsch, and not Medaries, negligent.

II. DAMAGES
All three appellants contend that the jury committed manifest error in awarding damages without considering DeRouen's alleged earning potential and reducing her past lost wages accordingly. In light of this earning potential, they argue that she was not entitled to any award for lost earning capacity. By answer to the appeal, the DeRouens seek increases in the awards for past and future lost wages, general damages and loss of consortium.

Mitigation
As background, we first briefly address the basis for these awards and then consider their soundness with respect to any duty to mitigate. Plaintiffs' economist, Dr. Moser, and defendants' economist, Dr. Culbertson, both provided estimates of past lost wages to the jury. The jury obviously found $37,225.74, Dr. Moser's estimate representing DeRouen's average salary over 1985, 86, and 87, most reasonable. This figure was well within the range of projected estimates, from $33,982.64 to $50,000, for her yearly earnings. These estimates were also rather conservative and did not take into account normal wage increases. Moreover, the jury was entitled to accept Dr. Moser's economic evaluation over that of Dr. Culbertson's. American Motorists Ins. Co. v. American Rent-All, 579 So.2d 429 (La.1991); Crane v. Exxon Corp., 613 So.2d 214, 226 (La.App. 1st Cir.1992). Thus, her past economic loss over 5.5 years, including fringe benefits at 15.5 percent of her wages, totalled $236,476 ($37,225.74 × 5.5 yrs. = $204,741.57 × .155 = $31,734.94 + $204,741.57 = $236,476).
With regard to future earnings, both economists again submitted figures. Dr. Moser's calculations were based on four different estimated annual earnings, 20.45 fringe benefit ratio, a work life expectancy of 9.77 years and a three percent discount factor. Dr. Moser's estimates ranged from $335,197.07 to $214,749.96 based on a $42,123.96 annual salary, which was offset by potential future earnings of $4.25, $6.00, $8.00 and $10.00 an hour. Dr. Culbertson's estimates were, of course, much lower, ranging from $130,670 to $69,920 because they were premised upon the assumption that DeRouen could return to her former job as an x-ray technician. He also used a 15.5 fringe benefit ratio, 7.8 year work life expectancy, and four percent discount factor. Considering all this evidence, the jury ultimately awarded her $150,000, clearly believing that she could return to some type of employment in the future.
Appellants contend, however, that DeRouen could have returned to work as early as May 1988, and therefore request a reduction in past lost wages for those potential earnings and elimination of the award for loss of earning capacity. An injured plaintiff has a duty to take reasonable steps to mitigate damages, including attempting to find suitable employment if she is, in fact, employable. Parmelee v. Martin Marietta Michoud, 566 So.2d 441 (La.App. 4th Cir.1990); American Motorists Ins. Co. v. American Rent-All, supra; Burke v. Safeway Stores, Inc., 554 So.2d 184 (La.App. 2d Cir.1989).

Past Lost Wages
The only evidence suggesting that DeRouen could return to work less than one year after the injury was Dr. Irby's statement, in a letter to McLemore dated May 2, 1988, that she try to resume part-time employment in May at St. Francis (subject to restrictions and limitations) and that he anticipated full-time hours in August. DeRouen read the letter, but was concerned that she would not be able to perform the essential functions of her former job and did not want to risk losing her disability benefits, her family's sole source of income. Instead, because at this time both she and Dr. Irby anticipated that her foot would soon return to normal, she preferred to wait and return full-time in August, with no limitations. However, DeRouen's condition never improved. In fact, over the next nine months, Dr. Irby saw DeRouen regularly, documented numerous problems with spasms in her *486 foot and back, cramping in her calf and swelling of her foot, and continued to prescribe pain medication. Then, in February 1989, she suffered a severe setback and again lost control of her foot. By July 1989, DeRouen had improved to only slightly above the level of functioning she possessed before her setback. DeRouen continued to see Dr. Irby through May 1993; during this time, he documented complaints of significant amounts of pain and cramping in her foot and back. Dr. Irby's office notes also show that she was taking pain medicine at least through February 1992. Significantly, after July 1989, Dr. Irby never again recommended to plaintiff that she return to work.
DeRouen actually attempted some sedentary work, answering the phone for Stewart for two days, but she testified that it caused her foot to swell and she experienced back pain. Stewart corroborated this. In February 1992, she applied to Stewart's personnel service; the search proved fruitless.
The only other record evidence of DeRouen's condition is Vernon Moss's functional capacity assessment of her physical ability as of September 1992. DeRouen performed poorly on 23 out of 29 physical tests. Moss, like Dr. Irby, classified DeRouen's capabilities at the sedentary level, at best. He defined sedentary work as lifting and carrying no more than 10 pounds, occasionally lifting small things, sitting only six hours a day, and standing and walking no more than two hours a day.
It is appellants' burden to prove that DeRouen unreasonably failed to mitigate her damages. Jacobs v. New Orleans Public Service, Inc., 432 So.2d 843 (La.1983). Appellants argue that McLemore would have permitted DeRouen to return to her former job, which he would have tailored to suit her specific needs. At trial, however, McLemore candidly admitted that the hospital has not offered her a job and refused to agree at that time to rehire her. Additionally, McLemore plainly refused to make any assurances of job security if she could not perform essential functions of the job. Further, he admitted he did not know the results of Moss's functional capacity assessment. Mrs. DeRouen, who has worked as an x-ray technician for the past 27 years, testified without contradiction that she could not perform the essential functions of her job. Further, she testified that she suffered severe depression and embarrassment because she could not handle even simple tasks. Mr. DeRouen testified that upon discussing Dr. Irby's suggestion that she return to work part-time, he told his wife, "you can't even make your own bed, Shirley, how in the world do you think you're going to work?" 25847-CA, Vol. III, p. 720. Jerry Stewart observed DeRouen during the few days she worked for him simply answering the telephone and testified to the severe swelling of her foot. Upon viewing this evidence in its entirety, the jury, which was in the best position to weigh and assess the witnesses' credibility, obviously believed that Shirley DeRouen was not able to return to her former profession.
As for sedentary or light duty work, the jury was not clearly wrong in finding that DeRouen could not perform this type of employment prior to trial. DeRouen had no typing or computer skills and was therefore not qualified for clerical work. Though Dr. Irby suggested a position as receptionist, Jerry Stewart testified that there were no positions available in the Monroe job market for a non-typing receptionist. Louis Lipinski's more detailed job market survey confirmed this and further indicated that there were no openings for clerical positions in general.
Moreover, as late as September 1992, DeRouen's condition did not allow her to sit, according to Moss, for more than six hours a day and Mrs. DeRouen, herself, testified that she could not sit for long periods of time without suffering pain and swelling. Stewart, as noted, corroborated this. The record also shows that through at least February 1992, DeRouen had continuously experienced significant pain, requiring use of pain medicine. Additionally, both Mr. and Mrs. DeRouen testified to her severe depression after the accident, particularly after she learned that her nerve damage was permanent and she would never be able to function normally. Finally, appellants did not attempt to show that the accommodations necessary *487 for DeRouen to return to any type of employment were reasonable.
Considering the evidence in its entirety, the jury was entitled to conclude that Shirley DeRouen did not unreasonably refuse to seek employment between her accident and trial. The record supports this view and we cannot substitute the factfinder's reasonable evaluations of credibility or inferences of fact for our own, even if we would have weighed the evidence differently. Stobart v. State, Through Dept. of Transp. and Dev., supra. The jury's findings are entitled to great deference on appeal. Rosell v. ESCO, 549 So.2d 840 (La.1989). The jury was not plainly wrong to find, on the record presented, that DeRouen was unemployable between her accident and trial.
By answer to this appeal, Mrs. DeRouen requested an increase in past lost wages, but failed to brief the issue. It is thus deemed abandoned. U.R.C.A. Rule 2-12.4. In any case, the record does not suggest that the award was inadequate. The jury's award for past lost wages will be affirmed.

Future Loss of Earnings
With respect to future earnings, the record wholly supports that DeRouen suffered a decrease in her earning capacity. Loss of earning capacity is based on the plaintiff's capacity to earn money rather than her actual wages before the injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). An award for impairment of earning capacity encompasses the loss of plaintiff's earning potentialthe loss of her ability to do that for which she is equipped by nature, training and experience. Coffin v. Bd. Of Sup'rs of La. Univ., 620 So.2d 1354 (La.App. 2d Cir. 1993); Burke v. Safeway Stores, Inc., supra. Also significant is plaintiff's inability to pursue work as vigorously as before the accident. Hobgood v. Aucoin, 574 So.2d 344 (La.1990). Because loss of earning capacity cannot be calculated with mathematical certainty, the factfinder is accorded great discretion in making such an award. La.C.C. art. 2324.1; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); Burke v. Safeway Stores, Inc., supra at 190. Sound discretion, however, must be exercised to render awards consistent with the record and avoid injustice to either party. Burke v. Safeway Stores, Inc., supra.
DeRouen, a lifelong x-ray technician, whose education, training, and experience is limited to that field, now suffers a 23 percent partial and permanent disability over her entire body and can no longer perform many essential functions required for the job. One permissible view of the evidence is that she can no longer work as an x-ray technician and with her limitations will be relegated to performing light duty work in the future. Jerry Stewart, manager of Heritage Personnel Services, testified that he was unable to find DeRouen a job, and in his opinion, it would be extremely difficult to place her in the competitive Monroe job market.
State Farm and Audirsch argue that as a direct result of the recent ADA, 42 U.S.C. § 12101 et seq., effective July 1992, it is easier for a disabled individual to obtain employment; consequently, they urge DeRouen's earning capacity has not changed. According to Lipinski, otherwise qualified, disabled employees must now be reasonably accommodated; he found that mobile stools and lifts to carry and transfer patients were available for x-ray technicians. Even given these accommodations, however, the jury was not clearly wrong in finding that an x-ray tech job significantly exceeds DeRouen's functional abilities. Her speed and mobility are substantially limited and she testified that she can no longer respond properly in an emergency situation. She thus places her patients' health and safety, as well as her own, in jeopardy. In light of DeRouen's decreased mobility and sedentary level of functioning, and the failed attempts to place her in the Monroe job market, the jury was not clearly wrong to find that the ADA does not remedy her decreased earning capacity.
Considering the instant record and the breadth of the jury's discretion, we simply cannot say that the jury abused its discretion in awarding DeRouen $150,000 for future economic loss. Furthermore, this award is not abusively low. It is affirmed.

*488 General Damages
In assessing damages in tort cases, much discretion is left to the judge or jury. La.C.C. art. 2324.1. We may only disturb such an award on review if the record reveals a clear abuse of discretion, based upon the specific injuries and their effect on the particular individual. Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993); Reck v. Stevens, 373 So.2d 498 (La. 1979). After finding such abuse, we may consider whether the contested award is truly disproportionate to past awards for similar injuries. Youn, supra.
The jury awarded $150,000 for past and future physical injury, pain, suffering and mental anguish and $50,000 for permanent disability. Dr. Irby assessed a 23 percent partial and permanent disability rating. DeRouen suffers occasional spasms in both her back and foot and has trouble sitting for long periods of time. She now wears a brace, but is embarrassed by it and her difficulty climbing stairs and walking. DeRouen demonstrated for the jury her diminished ability to walk and climb stairs. She also stated that she has stumbled and fallen in the past, though not while wearing her brace, and worries about this occurring. Because of this fear of falling, she has become less confident and more dependent on others. She is less physically active outdoors than before the injuries, but is still able to and does attend social events.
Unquestionably, DeRouen has suffered in the past due to these injuries and will have to learn to cope with her disability in the future. Nevertheless, on this record, we do not deem a total general damage award of $200,000 to be abusively low. It is affirmed.

Loss of Consortium
The jury awarded Mr. DeRouen $500 for loss of consortium. On appeal, he claims this amount is clearly inadequate. We agree. This court recognizes the loss of the following elements in analyzing a claim for consortium: love and affection; society and companionship; sexual relations; performance of material services; right of support; aid and assistance; and felicity. Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985).
Mr. DeRouen's uncontroverted testimony established that Mrs. DeRouen's entire demeanor and personality has changed since the accident. After the accident, his outgoing, personable wife became a hermit; he testified that she was embarrassed about her brace and awkward gait. As a result, they were unable to attend many social functions for some time following the accident. In addition, he and his wife led a very active life before her injuries, boating and taking trips to amusement parks, but are no longer able to go on these outings. Mr. DeRouen was afraid she would fall if left alone, even in their own home. Both he and his son had to accompany and physically support Mrs. DeRouen on outdoor walks. He also testified that she became deeply depressed because she could not work or complete even simple tasks, such as household chores; Mr. DeRouen and his son assumed many of these duties. Given these facts, an award of only $500 is abusively low. The lowest amount we could affirm under the circumstances is $5000. Cf. Bade v. Wade, 607 So.2d 927 (La.App. 2d Cir.1992); Finley v. Bass, supra.

Apportionment
The Fund claims that the jury committed manifest error in apportioning it 70 percent of the damages, urging it was responsible only for the lesser of the two injuries, her foot.
Where multiple accidents and tortfeasors are involved, each tortfeasor is liable only for the direct and proximate results of his wrongful acts. Sanders v. Collins, 551 So.2d 644 (La.App. 1st Cir.1989), writ denied, 556 So.2d 1261 (1990). Here, the original tortfeasor, Audirsch, is liable for 100 percent of DeRouen's damages because she is the legal cause of 100 percent of the harm (though she may not ultimately bear the entire judgment). Lambert v. United States Fidelity & Guaranty Co., supra. The Fund correctly asserts that it is not liable for DeRouen's initial back injury, resulting from her fall in Audirsch's beauty shop. However, we decline to apportion damages, as the Fund suggests, according to the relative assignments of disability for each injury, roughly twice as much for the back as for the *489 foot. In assigning 70 percent of the damages to St. Francis's malpractice, the jury obviously placed more emphasis on the nerve damage and resulting foot injury. Upon thorough review of the instant record and much consideration, we find the evidence sufficient to show that the foot injury affected DeRouen more severely than her back. In sharp contrast to the voluminous testimony regarding the deleterious effects from her foot injury, there is only limited testimony, even by Mrs. DeRouen herself, about prolonged negative effects from the back injury. It is apparent from Mrs. DeRouen's testimony that she was more distressed about wearing a brace, her unsteady gait, her inability to engage in physical activities and decreased mobility rendering it impossible to continue her chosen profession, than occasional stiffness and pain in her back. On this record, we do not consider the jury's apportionment to be manifestly erroneous. It will be affirmed.

III. JURY INSTRUCTIONS
Audirsch and State Farm claim that the trial court erred in failing to instruct the jury on the ADA, 42 U.S.C. § 12112, in contravention of their specific written request. 25848-CA, Vol. I, p. 190. To preserve this issue for appeal, a timely objection must be made on the record by appellants, which states specifically the matter to which they object and the grounds of that objection. La.C.C.P. 1793 C; Menzie Tile Co. v. Professional Centre, 594 So.2d 410 (La.App. 1st Cir.1991), writ denied, 600 So.2d 610 (1992). Audirsch and State Farm failed to make sure that their objection (if made) was preserved in the record; a mere assertion in brief that timely objection was made after the jury retired is insufficient. Menzie, supra. This issue is thus not properly before this court.

CONCLUSION
Based on the foregoing, the trial court judgment is amended to increase the award to Robert DeRouen for loss of consortium to $5000. In all other respects, the judgment is affirmed. The judgment, as amended, is affirmed. Costs of this appeal are assessed against appellants, one-half to Pam Audirsch and State Farm and one-half to the Patients Compensation Fund.
AMENDED AND AFFIRMED.
VICTORY, J., concurs in part, dissents in part.
VICTORY, Judge, concurring in part, dissenting in part.
I concur in the majority's result except in two aspects:
(1) The jury's verdict compensating Ms. DeRouen for past lost wages of $236,476 as if she could not work at all before trial is inconsistent with the verdict of $150,000 for future loss of earning capacity, indicating an ability to perform some work in the future. Ms. DeRouen's condition reached maximum improvement long before trial. She clearly had the ability to return to some work long before trial, thus I would reduce the jury's award of past lost wages to reflect this ability.
(2) The jury was clearly wrong in apportioning damages 70/30 based on the evidence presented. I would reapportion fault at 50/50.
NOTES
[1] The DeRouens also settled and executed a release with Medaries and his insurer; however, our resolution of the liability issue precludes discussion of this.
[2] The original tortfeasor is liable not only for the injuries he directly causes, but also for the tort victim's additional suffering caused by inappropriate medical treatment by the health care provider who treats the initial injuries. The action for contribution is still available to the original tortfeasor; here, apportionment of fault is necessary. Each party is then liable for his virile share. This result relieves the tort victim of proving which of the two tortfeasors caused specific injuries and appropriately places the burden on the original tortfeasor whose actions are the legal cause of all of the victim's injuries. Lambert v. United States Fidelity & Guaranty Co., 629 So.2d 328 (La.1993).